[Crim. No. 8767.   In Bank.   Feb. 23, 1967.]

THE PEOPLE, Plaintiff and Respondent, v. RAYMOND HENRY GOEDECKE, Defendant and Appellant.

852

E. Stanley Conant, under appointment by the Supreme Court, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and S. Clark Moore, Deputy Attorney General, for Plaintiff and Respondent.

BURKE, J.—Raymond Henry Goedecke was indicted for the murder of his father, mother, brother, and sister. The jury found him guilty of first degree murder of his father and second degree murder of the other victims, determined that he was sane when he killed his father and insane when he committed the other killings and fixed the penalty at death for the murder of his father. Motions for a new trial and for reduction of the sentence were denied. The court found Goedecke presently sane and entered judgment sentencing him to death. His appeal is before us automatically under subdivision (b) of section 1239 of the Penal Code.

Defendant contends that the evidence is insufficient to support the verdict that the murder of his father was of the first, rather than the second degree; that the erroneous admission of evidence resulted in a miscarriage of justice; that the prosecutor was guilty of misconduct; and that the evidence is insufficient to support the verdict of sanity. We have concluded that the latter three contentions are without merit but that the judgment should be reduced to murder of the second degree.

About 6:15 a.m. on August 15, 1964, defendant, who was then 18, left a church camp to return to his home, a distance of about 50 miles. He had driven to the camp the night before

accompanied by two young friends, both girls. The girls left the camp with him, and, after taking the first girl home, defendant and the second girl (Christine) drove to his home, arriving about 7:30 a.m.

When they entered the house no one was about. Defendant called out, "Get up you lazy bones," and went down the hallway toward the bedrooms. Christine, who had remained in the kitchen, heard defendant make a loud noise and say something to the effect that they were dead. She went back to the bedrooms and saw the bodies of defendant's 8-year-old brother, Mark, and his parents, Mr. and Mrs. Henry Goedecke. The body of defendant's 15-year-old sister, Ellen, was later found in her bedroom. All four had been beaten about the head many times with an iron rod, and the father had been stabbed repeatedly. According to the autopsy surgeon, the father's death was due to multiple stab wounds, skull and facial fractures, and contusions of the brain.

Christine telephoned the police, and she and defendant waited until the police arrived a few minutes later. After looking in the house, and talking to defendant and Christine, the police drove them to the police station to obtain statements from them as material witnesses.

Following a conversation with defendant at the station the police, upon inspection of his person, saw what appeared to be blood in his hair and a fleck of blood on his ear. They asked him to remove his clothing and after he did so they observed numerous stains. An analysis revealed that several of the substances on his person were human blood, and an examination of shirts found in his car disclosed faint bloodstains. On August 16, 1964, the police made lifts of fingerprints in defendant's house. Bloody prints on a sink and a door molding were identified as defendant's.

Persons who attended the church camp gave testimony from which it could be inferred that defendant left the camp during the night of August 14, 1964, and an attendant for a service station in defendant's home city testified that defendant stopped at the station sometime between 2 and 4 a.m. on August 15, 1964, and used the restroom. A towel in the restroom was found to have human blood on it.

Evidence was introduced that a few days before the killings defendant and his father had an argument about his moving out of the home, that defendant said to his father, ". . . you have taken advantage of me for six and a half years and I can't take it any more," and that defendant told a friend

that he did not want a hatred to grow between himself and his father and intended to leave home but would continue to work for his father.

Defendant took the stand in his own behalf and admitted killing his parents and brother and sister but said that he did not know why he killed them. He gave the following version of the events on the night in question: After attending a religious program at the church camp, he slept in his car. He awoke during the night and went for a drive. After driving awhile, he decided to go home for some coffee. He parked across the street from his house, and as he passed through his garage he kicked an iron bar and picked it up. He wrapped a towel around the bar, and he removed his shoes and socks in the kitchen, a habit he acquired when new carpeting was laid in his home. He then went into his parents' bedroom and struck his father several times with the bar and then hit his mother a number of times. His father began to sit up, and defendant again struck him repeatedly. He then hit his mother some more. Afterwards he went into the bedrooms of his sister and brother and struck them many times. He washed up in the bathroom and then returned to his parents' bedroom and saw his father attempting to crawl towards the door. Defendant smoked a cigarette as he watched his father struggle for awhile. On seeing his father's hunting knife on a chest he thought, ''Maybe this will finish him off.'' He then stabbed his father a number of times. As he left the house, his thought was, ''Raymond, get out of here.'' He did not know what was in his mind during the episode except the two quoted thoughts.

The defense introduced evidence that defendant had a good relationship with his father and other members of his family. Psychiatric testimony concerning defendant's mental condition on the night of the killings was also introduced by both parties and is summarized later herein.

The jury returned verdicts of first degree murder as to the killing of defendant's father and second degree murder as to the other victims.

At the sanity trial it was stipulated that all evidence received during the trial on guilt be admitted. The prosecution also introduced testimony by psychiatrists that defendant was legally sane when he committed the murders. Defense psychiatrists testified to the contrary.

The jury found that defendant was sane at the time of the

murder of his father and insane at the time of the other killings.

In considering the question of the degree of murder committed we refer first to what was said by this court in *People* v. *Wolff*, 61 Cal.2d 795, 818-819 [40 Cal.Rptr. 271, 394 P.2d 959], "This problem . . . [whether the evidence is insufficient to support the trial court's finding that the murder was of the first, rather than the second, degree] is by no means new to us. In dealing with it we recognize that every relevant and tenable presumption is to be indulged in favor of sustaining the judgment of the trial court; but when a proper case appears (Pen. Code, § 1181, subd. 6) we do not hesitate to modify the judgment to murder of the second degree and affirm it as modified."

In the instant case defendant's defense was that of "diminished responsibility," more accurately designated as "diminished capacity" (see *People* v. *Anderson*, 63 Cal.2d 351, 364 [46 Cal.Rptr. 763, 406 P.2d 43]), in that mental impairment prevented him from acting with deliberation and premeditation. In support of this defense he produced expert and nonexpert testimony. With respect to the defense the court stated in *People* v. *Henderson*, 60 Cal.2d 482, 490-491 [35 Cal.Rptr. 77, 386 P.2d 677]:

"It can no longer be doubted that the defense of mental illness not amounting to legal insanity is a 'significant issue' in any case in which it is raised by substantial evidence. Its purpose and effect are to ameliorate the law governing criminal responsibility prescribed by the M'Naughton rule. (See Lindman & McIntyre, The Mentally Disabled and the Law (1961) 355-356.) Under that rule a defendant is not insane in the eyes of the law if at the time of the crime he knew what he was doing and that it was wrong. Under the *Wells-Gorshen* rule of diminished responsibility even though a defendant be legally sane according to the M'Naughton test, if he was suffering from a mental illness that prevented his acting with malice aforethought or with premeditation and deliberation, he cannot be convicted of murder of the first degree. This policy is now firmly established in the law of California (*People* v. *Gorshen*, 51 Cal.2d 716 [336 P.2d 492]; *People* v. *Baker*, 42 Cal.2d 550, 569-571 [268 P.2d 705] . . . ; *People* v. *Sanchez*, 35 Cal.2d 522, 526-529 [219 P.2d 9] . . . ; *People* v. *Wells*, 33 Cal.2d 330 [202 P.2d 53]; *People* v. *Harris*, 29 Cal. 678, 683-684). . . ."

What was said with reference to premeditation in

*People* v. *Wolff, supra,* 61 Cal.2d 795, 822, is pertinent here: "Certainly in the case now at bench the defendant had ample *time* for any normal person to maturely and appreciatively reflect upon his contemplated act and to arrive at a cold, deliberated and premeditated conclusion. He did this in a sense—and apparently to the full extent of which he was capable. But, indisputably on the record, this defendant was not and is not a fully normal or mature, mentally well person. He knew the difference between right and wrong; he knew that the intended act was wrong and nevertheless carried it out. But the extent of his understanding, reflection upon it and its consequences, with realization of the enormity of the evil, appears to have been materially—as relevant to appraising the quantum of his moral turpitude and depravity—vague and detached. We think that our analysis in *Holt* [*People* v. *Holt,* 25 Cal.2d 59 (153 P.2d 21)] of the minimum essential elements of first degree murder, especially in respect to the quantum of reflection, comprehension, *and turpitude of the offender,* fits precisely this case: that the use by the Legislature of 'wilful, deliberate, and premeditated' in conjunction indicates its intent to require as an essential element of first degree murder (of that category) substantially more reflection; i.e., more understanding and comprehension of the character of the act than the mere amount of thought necessary to form the intention to kill.''

Here, Dr. Robert Lentz, a court-appointed psychiatrist, who testified for the defense, stated that in his opinion from the time defendant went to sleep at the church camp until he awakened the next morning he did not know what he was doing and was in ''a dissociative state when there was a lack of consciousness for—of intention and knowledge.''

Dr. Carl Graner, Jr., a psychiatrist testifying for the defense, similarly stated that in his opinion on the night of the killings defendant was unable to premeditate the killing of a human being or to form any intent.

Dr. Gloria Taylor, a court-appointed psychiatrist, who testified for the prosecution, expressed her opinion that defendant was capable of forming an intent to kill and of deliberation; that ''he was an intelligent young man who was able to formulate plans for the future;'' and that he ''didn't have any gross mental disorder which in any way, I felt, would be able to keep him from being able to form such a plan.'' She expressed the view that he did not have a dissociative reaction during the killing. She further stated that he had certain

characteristics of a schizoid personality; she pointed out that that is not a psychotic diagnosis and distinguished it from "schizophrenic" stating that a schizophrenic reaction is a psychotic diagnosis.

Dr. Alfred Larson, a psychiatrist testifying for the prosecution, stated that in his opinion defendant "was capable of exercising judgment [during the period when the killings were committed] and was not suffering from any mental disorder which might impair his ability to discern right from wrong" and that in his examination he did not ascertain any history of mental disorder that would preclude defendant from formulating an intent to kill. He further stated he believed that if defendant had a dissociative reaction, it occurred after the crime had begun and was a product rather than a cause.

Thus, although there was a direct conflict with respect to defendant's ability to form an intent to kill and to premeditate the killing, two psychiatrists saying that he had that ability and the remaining two taking the contrary view, there was no psychiatric testimony as to the *extent* to which defendant could *maturely* and *meaningfully reflect* upon the gravity of his contemplated act. In other words, even though we assume, as we must, that the trier of fact determined that defendant did have the mental capacity at the time to form the intent to kill, this conclusion does not foreclose our inquiry in a perplexing murder of the kind here present as to whether the evidence was sufficient to find defendant guilty of murder of the first degree.

In *People* v. *Wolff, supra,* 61 Cal.2d 795, 818, it was quite clear that the defendant had the intent to kill and to a limited extent the ability to premeditate. This court, in concluding that the judgment should be reduced from first to second degree murder, emphasized that the controlling issue as to degree depends not alone on the character of the killing but also on the question of personal turpitude of the actor. In the present case, the bizarre nature of the crime is even more out-of-character for the defendant to have committed than was true in *Wolff.* This defendant's lack of emotion when interviewed concerning the multiple killings both immediately after the perpetration and in subsequent interviews all confirm that this was not a mentally and emotionally normal individual. For example, Dr. Larson testified that when defendant related to him the details of the crime, "As an interviewer, I was aghast at the considerable detail he

went into. Sometimes he talked about these things as if he sort of relished the details, instead of rather reluctantly admitting to details, he would proffer them almost with a bit of, 'See, see what I can do better than anyone else,' and that is not very good.''

Defendant's actions during the commission of the killings and afterwards were completely foreign to his character and to his relationship with his family, as testified to by his pastor and others who had intimate acquaintance with both defendant and the other members of the family. Thus, as in *Wolff*, it appears from the record that although defendant knew the difference between right and wrong and that the intended act was wrong, the extent of his understanding, his reflection upon it, and its consequences, with realization of the enormity of the evil, was materially vague and detached and fell short of the minimum essential elements of first degree murder, especially in respect to the quantum of reflection, comprehension and turpitude of the offender. Here, the defendant was so precariously balanced on the edge of insanity that in the few seconds following his inflicting of mortal wounds upon his father, the jury found him to have plummeted into insanity so that the continuing rain of blows upon the three remaining members of his family was found to have been delivered by him while insane. The holdings of *People* v. *Holt, supra,* 25 Cal.2d 59, and *People* v. *Wolff, supra,* 61 Cal.2d 795, fit precisely this case in our opinion.

Therefore, upon the facts and upon the law we are satisfied that the evidence fails to support the finding that the murder was of the first degree, but that it amply sustains conviction of second degree murder.

█ Defendant next contends that evidence of statements he made at the police station between 10 and 11 a.m. on August 15, 1964, was erroneously admitted over an objection on the ground that he had not been advised of his rights to counsel and to remain silent.[1] On the morning of August 15 the police drove defendant and Christine to the police station to obtain statements from them as material witnesses concerning their finding the bodies and their activities during the

---

[1] The trial in the instant case began after the decision was rendered in *Escobedo* v. *Illinois,* 378 U.S. 478 [12 L.Ed.2d 977, 84 S.Ct. 1758], but before the decision in *Miranda* v. *Arizona,* 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974]. The principles enunciated in *Escobedo* but not those in *Miranda* are therefore applicable here. (*Johnson* v. *New Jersey,* 384 U.S. 719 [16 L.Ed.2d 882, 86 S.Ct. 1772]; *People* v. *Rollins, ante,* p. 681 [56 Cal.Rptr. 293, 423 P.2d 221].)

previous day. The police then had little evidence incriminating defendant; the main facts known to them were that defendant and Christine were the ones who found the bodies, defendant did not appear to be showing much emotion at his home, two damp shirts were found in his car, when the police noticed his hand might have been hurt he explained that he cut his finger on his car door, and in response to an inquiry as to his whereabouts the prior night he stated that he was at a church camp.

At the police station after a conversation with Christine the police talked with defendant from 10 to 11 a.m. The officer who conducted the interview testified that defendant was not then under arrest or in custody, that the officer could not rule defendant out as a suspect but hoped ''he wasn't,'' and that the officer was ''just questioning'' him ''as a material witness.''

During the interview defendant made several admissions, such as that his feeling toward his father could be considered to be hatred. He did not, however, confess to the murders and to the contrary maintained the same alibi throughout the period in question.

A defendant's statements cannot properly be introduced into evidence where (1) the investigation was no longer a general inquiry into an unsolved crime but had begun to focus on a particular suspect, (2) the suspect was in custody, (3) the authorities had carried out a process of interrogations that lent itself to eliciting incriminating statements, (4) the authorities had not effectively informed the defendant of his right to counsel or of his absolute right to remain silent, and no evidence establishes that he had waived these rights. (*Escobedo* v. *Illinois, supra,* 378 U.S. 478, 490-491; *People* v. *Dorado,* 62 Cal.2d 338, 353-354 [42 Cal.Rptr. 169, 398 P.2d 361].)

Here the investigation was still a general inquiry into an unsolved crime when defendant made the statements in question, and he was not yet in custody. He was being questioned as ''a material witness,'' and it was only after the interrogation when the police noticed blood on his person that attention began to focus on him as a particular suspect.

■ The prosecutor, in questioning witnesses at the trial, used excerpts from letters written by the defendant in jail, and defendant argues that such use of his letters, which assertedly were obtained without his knowledge, constituted a violation of his right to counsel under *Massiah* v. *United*

*States,* 377 U.S. 201 [12 L.Ed.2d 246, 84 S.Ct. 1199]. We do not agree. *Massiah* holds that the prosecution cannot introduce into evidence a defendant's own incriminating words, which federal agents had deliberately elicited from him after he had been indicted and in the absence of his counsel. (377 U.S. at p. 206 [12 L.Ed.2d at p. 250, 84 S.Ct. at p. 1203].) In *Massiah* the statements were elicited from the defendant without his knowledge that they would be overheard by a federal agent. The present case differs from *Massiah* in that here the excerpts from defendant's letters were not introduced into evidence and the statements were not deliberately elicited from him without his knowledge. According to defendant's own testimony, he knew that his statements would be seen by representatives of the state who censored his mail and might be turned over to the district attorney.

Defendant claims that it was improper to admit evidence of his father's life insurance policies to show motive because, assertedly, there was no evidence that defendant knew of the policies or of his beneficial interest therein. Gerald Bendickson, the attorney for Henry Goedecke's estate, testified, over objection, that decedent had life insurance policies under which the total amount that might be paid was in excess of $60,000 and that defendant was the ultimate beneficiary of the proceeds of the policies.

█ Evidence of a decedent's life insurance policy or will is inadmissible to show motive in the absence of any showing that the defendant knew of the existence of the policy or will. (*People* v. *Brown,* 81 Cal.App. 226, 239 [253 P. 735]; *People* v. *Gougas,* 410 Ill. 235 [102 N.E.2d 152, 154, 28 A.L.R.2d 852]; see 2 Wigmore, Evidence, pp. 328-330; Note 28 A.L.R.2d 857, 859; 40 C.J.S., Homicide, § 235.) █ Here no direct evidence was introduced that defendant knew of the policies. However, the fact that he was 18 and was the eldest son, that he lived with his parents, and that the policies were on the life of his father are circumstances tending to show such knowledge, and we are satisfied that the admission of the evidence did not constitute prejudicial error. There was evidence that the Goedeckes owned their home and some personal property, and it would be reasonable for the jury to infer that defendant knew he might acquire some property upon his father's death. There was substantial evidence of his guilt and of his sanity at the time of the murder of his father. Under the circumstances it is unlikely that the evidence of the policies affected the jury's verdicts.

With respect to the jury's determination as to his sanity defendant contends that there is no evidence to support the verdicts that he was sane when he killed his father and insane when he killed his other victims. As we have seen, although the evidence is in conflict, there is substantial evidence that he was sane when he killed his father. The sufficiency of the evidence to support the verdicts that he was insane when he killed the others is, of course, not an issue on this appeal.

■ Even if it be assumed that defendant may complain of inconsistent verdicts as to sanity, the record does not compel the conclusion that the verdicts are inconsistent. Defendant testified that he hit his father on the head several times with an iron bar, then hit his mother, then hit his father on the head some more, then beat his mother again, thereafter beat his sister and brother, and subsequently stabbed his father. The autopsy surgeon testified that the fractures suffered by the father were too numerous to count; that any one of the skull fractures could have caused death, although any one of them alone would not necessarily have caused death; that the cause of death was multiple stab wounds, skull and facial fractures, and contusions of the brain; that death would have resulted from the head injuries alone within a minute to a half hour or longer; and that in the absence of the head injuries the stab wounds would have produced death. Psychiatrists called by the prosecution testified that defendant was legally sane at the time of the killings, and defense psychiatrists testified to the contrary.

From the foregoing evidence, the jury could have found that defendant was legally sane when he inflicted the initial blows upon his father, that these were mortal blows which contributed to the father's death, and that immediately after inflicting the initial blows on his father he became insane. ■ A defendant who while sane inflicts mortal wounds that contribute to the death of another may properly be found sane even if thereafter while insane he inflicts additional wounds that also contribute to the death. (Cf. *People* v. *Lewis,* 124 Cal. 551, 559 [57 P. 470]; see also *People* v. *Brown,* 62 Cal.App. 96, 101 [216 P. 411]; *People* v. *Liera,* 27 Cal.App. 346, 347-348 [149 P. 1004].) The verdicts with respect to sanity are thus not inconsistent.

The judgment is modified by reducing the degree of the crime to murder of the second degree and, as so modified, is affirmed. The cause is remanded to the trial court with direc-

tions to arraign and pronounce judgment on defendant in accordance with the foregoing ruling.

Traynor, C. J., Peters, J., Tobriner, J., and Sullivan, J., concurred.

MOSK, J.—I dissent.

Admittedly there are more than superficial similarities between the instant case and *People* v. *Wolff* (1964) 61 Cal.2d 795 [40 Cal.Rptr. 271, 394 P.2d 959]. But there are also crucial legal and factual distinctions. In *Wolff* each of the four psychiatrists who testified gave as his medical opinion that the defendant suffered from a permanent form of schizophrenia, characterized by a complete dissociation between intellect and emotion, an inability to think conceptually, and an impaired judgment. Mr. Justice Schauer, writing for the court, makes repeated reference to the defendant's *"undisputed* mental illness" (p. 821), to *"indisputably* on the record, the defendant was not and is not a fully normal or mature, mentally well person" (p. 822), to his being "vague and detached" (p. 822), and to the "circumstances of his *undisputed* mental illness" (p. 823). (Italics added.) The key to *Wolff* was the total lack of conflict as to the youth's mental abnormality at the time he killed his mother.

Here, by contrast, there not only was a serious conflict in the testimony concerning the mental condition of the defendant, there was persuasive supportive evidence upon which the jury could reach its determination.

I pause to note that this was obviously a reflective and discerning jury. It eschewed the simple solution of declaring things to be all black or all white. The verdicts found defendant guilty of first degree murder in killing his father, and second degree murder in the deaths of his mother, sister and brother; they found defendant sane when he killed his father, and insane when he committed the other offenses. The jury thus concluded: (a) defendant killed his father, mother, sister and brother; (b) the killing of his father was wilful, deliberate and premeditated; (c) in that killing defendant had sufficient mental capacity to act with deliberation and premeditation, and to know and understand the nature and character of the act he was committing and that it was a violation of the rights of another; (d) he acted with diminished capacity when he killed his mother, sister and brother; (e) as a result of the heinous act of killing his father, he

suffered a dissociative reaction and did not have the mental capacity to know and understand the nature and character of his subsequent acts and did not then know the difference between right and wrong. The question before us is whether this conclusion is tenable under the evidence introduced.

There may be a normal inclination to assume that a religious young man would have to be of unsound mind to murder his father. There is, of course, a considerable school of academic thought contending that all homicides and, indeed, all crimes, are committed by persons who are mentally ill. (See, e.g., Abrahamsen, Who are the Guilty? (1952) pp. 125, 194.) I do not necessarily deprecate that concept, except to note that it has not as yet prevailed in either legislative or judicial forums.

This defendant, however, studiously planned and executed the murder of his father. At the camp he deliberately announced two or three times that he was sleeping in his car, in order to be able to leave and return undetected. He rolled his car down the hill and then let the clutch out so that the starting would not awaken any campers. Upon reaching his home he parked across the street, and took his shoes off when entering the house. After the murders, he washed blood off himself, then opened drawers and emptied the contents of his mother's purse onto the floor; the police later noted that the house had the appearance of being ransacked. En route back to camp, defendant disposed of the knife with which he had stabbed his father, stopped at a gas station and again washed himself and also washed some of his clothing. He slipped into the camp unnoticed. Upon returning to his home the next day with Miss Lansing, he preceded her inside and loudly announced his arrival, then feigned disbelief at finding the bodies.

His was a diabolically clever plot, in short, that might have succeeded except for his failure to remove a few tiny specks of blood from his hair and ear. This aroused police interest, and thereafter defendant's responses to routine investigatory questions confirmed their suspicions.

Concededly, time and plot alone do not automatically transform a homicide into murder of the first degree. (*People* v. *Wolff* (1964) *supra,* 61 Cal.2d 795, 822.) They are, however, strong evidence of the defendant's maturity, the extent of his understanding and reflection upon the deed, as well as an indication that he was aware of the enormity of the evil and the consequential reaction of society. Equally persuasive is

the undisputed evidence of defendant's clever and almost successful efforts to throw the police off the scent by disarranging the contents of the house to simulate a burglary, by disposing of the knife and surreptitiously reentering camp, and by feigning shock on discovering his victims' bodies—all in marked contrast to the prompt and meek surrender of the defendant in *Wolff*. This careful planning demonstrates, in the terminology of *Wolff* and *Holt* (*People* v. *Holt* (1944) 25 Cal.2d 59 [153 P.2d 21]), the substantial ''quantum of his moral turpitude and depravity.''

The majority here maintain that ''Defendant's actions during the commission of the killings and afterwards were completely foreign to his character and to his relationship with his family. . . .'' This assertion may be accurate with regard to his mother, sister and brother, but it does not square with the facts regarding his father. Indeed, there is considerable evidence of discord between son and father, some of it heated. They had quarreled as recently as the Tuesday before the killing; defendant had desired to leave the household but his father, who was also his employer, refused to permit him to do so; his father had struck him on at least one occasion; he resented his father's domination; several witnesses testified to hearing conflicts between them; and shortly before the murder, communication between the two had broken down. There is also evidence that defendant's ''character'' was not as exemplary as the majority opinion suggests. He had a poor record in high school and college, and was apparently no longer welcome at the church camp.

I turn now to the psychiatric testimony. Unlike *Wolff*, in which the prosecution offered nothing whatever to rebut the unanimous defense expert views on the defendant's diminished mental capacity, here we have a direct conflict on the issue. Dr. Robert Lentz testified that defendant was in a dissociative state from the time he went to sleep in his car until he awakened the next morning, and that there was a lack of consciousness as to any events occurring during the night. Dr. Carl Graner testified that defendant was incapable of forming any intent during the night in question.

Conversely, Dr. Gloria Taylor expressed the opinion that defendant did not sustain a dissociative reaction, and that he had the capacity to form an intent on the night of the killings. Prior to trial, Dr. Taylor had examined defendant and found he had certain characteristics of a schizoid personality. This is, of course, far short of schizophrenia, a psychosis.

Finally, Dr. Alfred Larson testified to his examination and expressed the opinion that defendant was capable of exercising judgment during the period in question, and was not suffering from any disorder which might impair his mental ability. Dr. Larson then discussed the phenomenon known as dissociation, describing it as a state in which one committing a crime of violence feels as if someone else is performing the act. He explained that "This happens, I would say, greater than ninety per cent of the inmates I have talked to described some sort of a reaction like this and it may have lasted from a few moments to a few minutes to a few hours and I have come to the conclusion that *dissociative reaction in situations like this very often is the product of the crime, rather than the cause of it.* It's a way of the mind to protect itself from the consequences of such a brutal thing that is going on in front of the individual, in which they themselves are committing the act. . . . When you take a youngster who has a weapon in his hand and is beating his father and mother to death, he has to do something with his mind to escape the severe penalty, the disgrace, the shame of the action, to hide from his eyes and from his personality what is going on, so the mind sort of normally goes into a state of dissociation to permit the act to be completed and I think this is what probably occurred in this case." (Italics added.)

Again, later in the proceedings, Dr. Larson testified that "the human mind, in most people, at least in our present civilization, is not keyed to the act of committing heinous crime, such as chopping up even strangers, let alone near relatives and when someone embarks upon such a rather heinous crime that is striking out, hitting, shooting, stalking or killing someone flesh and blood, near and dear to you, the mind must take some protective measure to you to stop the shock of it upon yourself. In this particular case the mind tends to dissociate for as much as needed to protect from the shock, otherwise people might break down hysterically right on the spot after the first blow, it's the only way for the mind to protect itself. . . ."

The majority apparently view the opinion of Dr. Larson with some skepticism. But it is obvious that the jury which saw and heard him was persuaded by his testimony. Certainly the conclusion that defendant was sane and capable of premeditating when he fatally assaulted his father, became dissociative as a result of the animal ferocity of that attack, and in the subsequent moments of insanity concluded the

slaying of the members of his family, is not an inherently illogical explanation of the tragedy.

It is not the function of an appellate court to reweigh the evidence when there is substantial testimony in support of the conclusion of the trier of fact. (*People* v. *Hillery* (1965) 62 Cal.2d 692, 702-703 [44 Cal.Rptr. 30, 401 P.2d 382] ; *People* v. *Robillard* (1960) 55 Cal.2d 88, 93 [10 Cal.Rptr. 167, 358 P.2d 295, 83 A.L.R.2d 1086].) Neither a bizarre case nor what to some may appear to be a paradoxical result justifies departure from this fundamental rule. Reliance upon *Wolff* should not be employed to absolve an emotionally unstable parricide from guilt of first degree murder where the evidence supports the judgment. As we said in *Wolff* on the sanity issue, "to accept defendant's thesis would be tantamount to creating by judicial fiat a new defense plea of 'not guilty by reason of schizophrenia.'' To do so (assuming *arguendo* that it were within our power) would be bad law and apparently still worse medicine.'' (61 Cal.2d at p. 815.)

I would affirm the judgment in its entirety.

McComb, J., concurred.