[Crim. No. 17215. First Dist., Div. Two. July 27, 1978.]

THE PEOPLE, Plaintiff and Respondent, v.
UNA ALICE BUSH, Defendant and Appellant.

## COUNSEL

Moore & Bell, Edward C. Bell and Vickie Young for Defendant and Appellant.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, Edward P. O'Brien, Assistant Attorney General, Clifford K. Thompson, Jr., and Franklin D. Elia, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**ROUSE, J.**—Defendant, Una Bush, was charged by information with the murder of her husband, Gary Bush, in violation of section 187 of the Penal Code. She pleaded not guilty and was tried by a jury. After all of the evidence was in, the trial court granted her motion for acquittal on the charges of first and second degree murder.

Thereafter, the jury returned a verdict finding defendant guilty of involuntary manslaughter, in violation of section 192, subdivision 2, of the Penal Code. The trial court denied her motion for a new trial, suspended the imposition of sentence and placed her on probation for a period of three years, subject to the condition that she serve the first 90 days in the county jail. Defendant filed a timely notice of appeal from the judgment of conviction.

We have concluded that, because the question of defendant's guilt was so closely balanced, the error of which she here complains was prejudicial; therefore, her conviction must be reversed. Under these circumstances, we shall set forth the evidence in some detail.

On November 9, 1976, Evangelista Lugo, a police officer employed by the Peralta Community College, lived next door to defendant and her husband on Lyons Avenue in Oakland. At approximately 3:15 or 3:30

a.m. that day, Officer Lugo was awakened by a voice screaming out his name. Upon looking out the side window of his home, he saw defendant, who was screaming, "Help me. Help me, my husband is hurt." Defendant was wearing a blue nightgown which was covered with blood.

Officer Lugo put on a bathrobe, went outside and joined defendant, who asked him to help her husband. He accompanied her through the back door of her home and into the kitchen, where he found Gary Bush lying on the floor in a pool of blood. Lugo instructed defendant, who was crying and hysterical, to call for the police and an ambulance. He then attempted to render emergency aid to the victim, who was still breathing at the time.

Juris Stabulis, an ambulance driver and attendant, arrived at the Bush home five or ten minutes later. A woman stuck her head out the window of the house and cried out to Stabulis, "Hurry. I killed him, I stabbed him. He is bleeding, he's dying." Stabulis entered the house and found the victim lying on his stomach in a large pool of blood on the kitchen floor. Stabulis turned the victim over, found several stab wounds and began bandaging them. However, the victim's pulse stopped while he was doing so. The victim was then placed on a gurney and carried from the scene while Stabulis unsuccessfully performed closed heart massage.

In the meantime, Officers Scurria and Ludwig of the Oakland Police Department had arrived on the scene. Officer Scurria did not testify at the trial,[1] but Officer Ludwig testified that when he arrived at the Bush home, defendant was seated on the living room couch and Officer Scurria was standing near her. Officer Ludwig stated that defendant was sobbing, crying and shaking. As the victim was wheeled out to the ambulance, Ludwig heard her say, "My husband is dead. My husband is dead, oh my God. I stabbed him. Gary, please don't die." Officer Ludwig then asked Officer Scurria if he had found the knife that had been used. Defendant volunteered that she knew where it was and pointed toward the bedroom. Ludwig entered the bedroom and found a kitchen-type steak knife lying on top of a dresser beneath a box of Kleenex.

Officer Ludwig testified that defendant's mother and sister then arrived and that defendant's mother asked her what had happened. Defendant replied, "He was fighting me. He hit me. I grabbed a knife and stabbed him. I know he is going to die. He was hurt so bad."

---

[1] Officer Scurria testified only at a pretrial hearing held outside the presence of the jury.

Witnesses Lugo and Ludwig both denied having noticed any signs that defendant herself had been injured. Ludwig was likewise unable to recall that she had complained of having incurred any injury. A photograph of defendant which was taken later that day indicated only that she had a cut on the index finger of her right hand.

Dr. McNie, an autopsy surgeon, examined the victim's body at 11:45 a.m. on the day of the killing. There were three superficial stab wounds on the victim's lower face and undersurface of the chin and three superficial scratches in the neck and shoulder area. There was one incised stab wound in the shoulder and one in the left hip. On the victim's chest were seven superficial scratches and four incised stab wounds. There was also an incised stab wound in the victim's left abdomen. In Dr. McNie's opinion, the cause of death was shock and hemorrhage due to multiple stab wounds with perforation of the heart.

The first two witnesses for the defense, Judge Raymond Reynolds and Emma Ike, both testified to defendant's excellent reputation in the community for peace and good order.

The defense next called Deila Liuzza, a neighbor of defendant's, who testified to a prior occasion when defendant had come to her door at 10 in the evening and asked that the police be called because her husband was beating her. On a subsequent occasion, Mrs. Liuzza had heard someone in the Bush home crying, "Oh, please, don't. Please don't."

Shannon Bush, the next witness for the defense, had been married to the victim, Gary Bush, during the period between November 4, 1969 and January 1972. She testified in considerable detail concerning the numerous beatings which Gary had inflicted upon her. One of these beatings occurred two days before the witness gave birth to Gary's child, and another occurred a few days thereafter. Shannon testified that on one occasion, when Gary had struck her, she had gone to the kitchen and grabbed a knife and that he momentarily stopped his attack. His mother had then entered the kitchen and forced him to leave the house. Shannon testified that although Gary sometimes seemed a little angry when he struck her, he seemed to have "fun" doing it, and immediately thereafter would act as though everything were perfectly all right. As a result of recurring beatings, Shannon finally left Gary and subsequently filed a complaint against him when he continued to molest her.

On cross-examination, Shannon admitted that she had never been hospitalized as a result of the beatings inflicted upon her and that she had never suffered a broken tooth, arm or leg. She stated that he had backed off on the one occasion when she threatened him with a knife. She also stated that although she feared being hurt by Gary, she did not actually fear for her life or believe that he would kill her.

Defendant Una Bush testified that she met Gary Bush in March 1975 and married him on September 20, 1975. Gary never struck her before they were married, and she had no knowledge of the beatings which he had inflicted upon his former wife. Three weeks after they were married, she and Gary got into an argument over going to the movies, and Gary slapped her. However, when she began to cry, he apologized, stated that he did not know what had come over him, and assured her that it would never happen again. Defendant testified that at the moment when he struck her, his whole expression changed, his eyes seemed to blur, and he seemed very angry. She was frightened by his behavior.

The next incident of violence occurred shortly thereafter, in October, when defendant had accidentally burned the chicken which she was cooking for dinner. Gary accused her of having burned the chicken on purpose. When she denied that this was the case and stated that she was hungry too, he accused her of lying and stated that she had acted out of spite. He then grabbed her by the arm, threw her down on the couch, stood over her and "barricaded" her. Each time she tried to rise, he knocked her back down, using the flat of his hand and his fist. Defendant testified that he hit her in the face, head and body, and that he struck her with greater force each time she tried to rise. Defendant ultimately succeeded in escaping, and ran to the home of her neighbor, Mrs. Liuzza, and asked her to call the police.

In December 1975, after defendant had become pregnant, Gary became enraged over a name and telephone number which defendant had written down for him. He denied knowing anyone named "James" who had that telephone number and insisted that defendant was involved with another man. When she protested her innocence, Gary slapped her, threw her on the bed and then onto the floor. He then pinned her shoulders down and put his knees on her stomach. Although defendant cried out that her baby would be hurt, defendant continued slapping her and hitting her, telling her that she was going to die and was "going to your grave." When Gary continued to ignore her repeated cries of

"Please don't," she pretended to lose consciousness and he then ceased his attack.

In March 1976, when defendant was five months pregnant, another such incident occurred. Gary became enraged when defendant, who was ill with the flu, asked him to prepare his own food. On this occasion, he struck her in the stomach with his fist with sufficient force to cause her to experience abdominal cramping and to vomit blood. Gary then called an ambulance and went with her to the hospital, where he admitted to the treating physician that he had struck her in the stomach.

The last such incident occurred in October 1976, four weeks before the fatal stabbing of Gary. Defendant's baby had been born in August and she had not been out for the evening since September. Gary had agreed to take her out, but then changed his mind. When defendant attempted to go alone, Gary struck her, threw her against the coffee table, and then repeatedly kicked her and hit her with his fist. He again told her that she was going to die and that he would send her to her grave. Defendant testified that she believed Gary, that he was in a rage, and that his whole appearance had changed. Gary ultimately released her when the baby began crying, and allowed her to go to the baby.

Defendant testified that for several days prior to November 8, 1976, Gary had been coming home very late from his job. Although he got off work at 10:30 p.m., he had been arriving home sometime between 2 and 4 in the morning. Defendant told him of her concern over being alone in the house with the baby at night, and he agreed to come home earlier. On November 8, he called her from work at 8 p.m. and stated that he had to stop by a friend's house after work, but would be home at midnight. Defendant agreed to have dinner ready for him at that time.

At 12:30 a.m., when Gary still had not returned, defendant ate dinner and went to bed. At 2:45 a.m., she heard him come through the front door and lock it behind him. He undressed and got into bed beside defendant, but then yelled at her to move over and kicked her in the back. Defendant got out of bed and went into the baby's room, where she lay down on an extra bed. She then heard Gary go into the bathroom and make gagging and coughing noises. When she heard him return to the master bedroom, she decided that since he was still awake, she would try to get him to discuss the problems with their relationship.

Defendant testified that she entered the master bedroom, saw that Gary was not interested in talking, and asked him to give her the keys because she was leaving. She then found a set of keys lying on the dresser and took them with her into the baby's room. After she had turned out the light and gotten into bed, Gary burst into the room, took the keys and told her that she was not going anywhere. Defendant then got up and walked toward the living room. As she was doing so, she looked into the master bedroom and saw a set of keys lying on the floor between the bed and the dresser. She leaned over to pick up the keys, and Gary then grabbed her by the back of her collar and threw her across the bed. Defendant got off the bed and headed toward the window which faced toward Officer Lugo's house. Gary seized her arm, twisted it, and took the keys from her. She then ran to the kitchen telephone with the intent of calling the police, but Gary jerked the receiver from her hand, advising her that she was making no telephone calls. He then began choking her with sufficient force to cut off her breath. Defendant testified that she was frightened and believed that Gary was trying to kill her. He then released his grip on her throat and flung her around, and she tried unsuccessfully to break free. However, Gary held onto her arm and then began beating her about the face and head. Defendant testified that she told him that if he did not stop, "one of these days I'm going to hurt you," and she explained that she made this statement in the hope that it would frighten Gary and cause him to stop hitting her. However, he responded by continuing to strike her while repeating, "You're going to hurt me, huh? Bitch, you gonna hurt me? I'm going to send you to your grave." At this point, defendant noticed a kitchen knife on the counter, and she seized it and "just started jabbing at him." According to defendant, Gary continued with his verbal taunts and continued to hit her. She testified that she did not think that the knife was even touching him because he just kept hitting her. Gary finally stopped hitting her, fell to his knees and said, "Baby, I'm hurt." Defendant screamed, "Oh, my God," ran to the bedroom to call the police, and then ran next door to ask Officer Lugo for help.

On cross-examination, the prosecutor elicited from defendant the fact that Gary had given her candy and flowers on Valentine's Day 1976, and that she had thrown them on the floor. Over a defense objection, the prosecutor also elicited from defendant the fact that she knew that she had become the beneficiary of an insurance policy on Gary's life one month before his death. She also admitted that she made a claim under said policy in order to pay for his funeral expenses.

The final witness for the defense was the coroner, Dr. McNie, who testified that a blood-alcohol test indicated that the victim was under the influence of alcohol at the time of his death. Gary's blood-alcohol level was such that, given his height and weight, he would have had to have consumed on an empty stomach and in a short period of time, 6 ounces of 100 proof whiskey, 7 ounces of 86 proof whiskey or 24 ounces of wine. Dr. McNie further testified that none of the wounds inflicted upon the victim would necessarily have incapacitated him immediately, and that even after sustaining the stab wound to his heart, he could still have engaged in vigorous activity for some five to ten minutes.

The prosecution called one rebuttal witness, Wanda Polk, who testified that she and her husband were both longtime friends of the victim. Mrs. Polk stated that because Gary was such a very good friend and because she believed in justice, she felt that she should speak up for his character. She recounted a telephone conversation with defendant, which occurred shortly after Valentine's Day 1976, and stated that defendant had told her that she had become very angry with Gary on Valentine's Day because she had cooked dinner for the two of them and he had brought one of his friends home. According to Mrs. Polk, defendant told her that she had thrown Gary's flowers and candy on the floor, and she also made the statement that Gary was always doing things that upset her and that "If he keeps aggravating me, I am going to kill him."

Defendant testified in surrebuttal and denied having ever had a conversation with Mrs. Polk during which she had threatened to kill Gary. She admitted that he had given her candy and a card on Valentine's Day and that she had thrown them on the floor. She explained that it was their first Valentine's Day together, that he had promised to take her out that evening, and that she became upset when he instead brought a male friend home to dinner. Defendant testified that she made no claim under Gary's insurance policy until she had first called her trial counsel and asked him whether she should do so. He advised her that she should submit her claim.

■ Defendant's first contention on appeal is that the trial court erred in refusing to give her proposed jury instruction to the effect that one who has received threats against her life or person by another is justified in acting more quickly and taking harsher measures for her own protection

in the event of assault, whether actual or threatened, than would a person who had not received such threats.[2]

In *People* v. *Torres* (1949) 94 Cal.App.2d 146 [210 P.2d 324], it was held to be prejudicial error for the trial court to refuse to give a similar instruction pertaining to prior threats by the victim. In that case, the defendant and the victim had become involved in a quarrel and fight, and when it was broken up, the victim threatened to kill the defendant. Two weeks later, the two men encountered one another outside the gates of a carnival, and the defendant fatally stabbed the victim in the abdomen. The testimony was sharply conflicting as to whether, on that occasion, the victim had threatened the defendant and made a gesture as though reaching for a knife in his pocket. The appellate court held that the defendant was entitled to an instruction concerning the effect of the prior threats made by the victim. The court pointed out that, although the trial court had given numerous instructions on self-defense and had repeatedly called to the jurors' attention the standard of the reasonable man both as to the fear of danger and the measures to be taken in defense, these instructions nevertheless should have been supplemented by a specific instruction concerning the effect of prior threats. (P. 152.) The appellate court noted that among those self-defense instructions which had been given by the trial court was one which stated that homicide was justifiable in self-defense when there was a reasonable ground to apprehend a design to do bodily injury "*and imminent danger of such design being accomplished.*" Another instruction given called upon the jurors to determine whether the defendant was justified in acting in self-defense "under the *immediate* circumstances surrounding the encounter . . . ." (P. 153.) The court held that while these instructions did not necessarily exclude the prior threats from consideration by the jurors, it was nevertheless possible that the reference to "immediate circumstances" would divert their attention from the previous threats. Hence, it was error to refuse the instruction on prior threats, and in view of the closeness of the case and the conflicting nature of the evidence, reversal was required.

---

[2]The full text of the instruction reads as follows: "One who has received threats against her life or person made by another is justified in acting more quickly and taking harsher measures for her own protection in the event of assault either actual or threatened, than would be a person who had not received such threats; and if in this case you believe from the evidence that the deceased made threats against the defendant and that the defendant because of such threats made previously to the transaction complained of had reasonable cause to fear greater peril in the event of an altercation with the deceased than she would have otherwise, you are to take such facts and circumstances into your consideration in determining whether the defendant acted in a manner in which a reasonable person would act in protecting her own life or bodily safety."

In *People* v. *Moore* (1954) 43 Cal.2d 517 [275 P.2d 485], the rule of the *Torres* case was held applicable to a factual situation similar to that before us. In that case, the California Supreme Court held that it was error for the trial court to refuse the defendant's proffered instruction on the effect of prior threats and that such error, among others, required reversal of the judgment in view of the closely balanced nature of the evidence.

Here, defendant's testimony was uncontradicted that, in the course of two prior beatings, her husband had threatened to put her in her grave. A reading of the self-defense instructions given by the trial court reveals that there was no reference to prior threats, but that the court did instruct the jury that homicide was justifiable when a person had reasonable ground to apprehend that he was in danger of death or great bodily injury and that there was *imminent* danger of such a design being accomplished. The court also instructed the jury that the danger must be apparent and "must be *present* and *imminent,* or must so appear *at the time* . . . ." (Italics added.) Under the reasoning of the *Torres* case, these instructions might well have served to divert the jurors' attention from the evidence of prior threats, hence the trial court ought to have given defendant's proffered instructions, specifically explaining the significance of those threats. Where, as in this case, there is evidence tending to show the making of threats of death or great bodily harm by deceased against the defendant, which are relied on as influencing or justifying defendant's act, instruction on the law of this subject is proper and, if not covered, a correct instruction on the subject proposed by one of the parties should be given. (*People* v. *Moore, supra,* 43 Cal.2d at p. 528.)

Defendant contends that the trial court erred in refusing to give her proffered instructions based upon CALJIC Nos. 5.10, 5.16, 9.02 and 9.05. CALJIC No. 5.10 states that a homicide is justifiable when committed while resisting an attempt to commit a forcible and atrocious crime. CALJIC No. 5.16 defines a forcible and atrocious crime as any felony which threatens, or is reasonably believed by the defendant to threaten, life or great bodily injury. CALJIC No. 9.02 states that any person who commits assault with force likely to produce great bodily harm is guilty of a crime. CALJIC No. 9.05 states that such an assault may be committed with hands or fists. Defendant concedes that the trial court gave the jury various instructions to the effect that a homicide was justifiable when committed by a person who had reasonable ground to apprehend that he was in danger of death or great bodily injury. However, defendant asserts

that the instructions summarized above should also have been given because section 197, subdivision 1, of the Penal Code, enumerates three separate instances in which homicide is justified: "[1] When resisting any attempt to murder any person, [2] or to commit a felony, [3] or to do some great bodily injury upon any person . . . ." Defendant reasons that the instructions given by the court covered the first and third instances specified in the statute, but not the second, and that she should not have been deprived of that additional defense.

Defendant's argument is not persuasive. If the situation in this case were one where defendant had committed a homicide while resisting an attempt to commit a forcible and atrocious crime against *a third party,* the instructions requested by defendant would have been appropriate. Here, however, the sole question was whether the homicide was justifiable because defendant acted in self-defense and with the reasonable fear that she was in danger of death or great bodily harm. The trial court so instructed the jury, and it seems likely that the giving of such instructions as those proposed by the defendant might well have confused the jury and placed a greater burden upon her.

Defendant complains of the fact that the court instructed the jury on heat of passion. She correctly points out that the trial court first advised the jury that although defendant was charged with murder, the court had granted her a judgment of acquittal as to that charge, therefore, she could be found guilty only of the lesser included offense of manslaughter. She argues that where, as here, the trial court determined as a matter of law that defendant was not guilty of either first or second degree murder, the court should not have instructed on heat of passion, since said doctrine no longer had any place in the action and could only serve to confuse the jurors. Defendant contends that the heat of passion instructions were especially confusing when considered in conjunction with the self-defense instructions given by the court; that the jurors were told, on the one hand, that an individual whose passions or fears were aroused under circumstances which would similarly have affected an ordinarily reasonable man, was guilty of voluntary manslaughter, and that, on the other hand, a killing committed under such circumstances was a justifiable homicide committed in self-defense.

Defendant's reasoning on this point appears to be more confused than persuasive. The evidence was such that the jury could have found defendant guilty of voluntary manslaughter or involuntary manslaughter

or could have acquitted her. The jury was properly instructed that if defendant acted out of fear of death or great bodily harm and did only what a reasonable person would have done in his own defense, the homicide was justifiable. The jury was also properly instructed that if defendant, while in the heat of passion, acted "rashly, without reflection and deliberation," she was guilty of voluntary manslaughter. The conflict which defendant claims to find in these instructions seems to us to be nonexistent. Moreover, the jury did not convict defendant of voluntary manslaughter, hence could not have been influenced by the instructions on heat of passion.

■ Defendant contends that the trial court erred in allowing the prosecutor, over a defense objection, to establish that on the date of the killing, defendant was aware that she was the beneficiary of an insurance policy on her husband's life. She asserts that this evidence was totally irrelevant, and that even if it did possess some minimal amount of relevance, its prejudicial effect outweighed its probative value, therefore it should have been excluded under section 352 of the Evidence Code.

The record reveals that during his cross-examination of defendant, the prosecutor asked her if her husband had a life insurance policy. Defense counsel promptly objected to the question as irrelevant, but the trial court overruled the objection and allowed the prosecutor to elicit from defendant the fact that she knew that she was the beneficiary of an insurance policy on Gary's life and that she had made a claim under such policy following his death.

Thereafter, the matter was presented in chambers, where defense counsel argued that it was improper for the prosecutor to raise the subject of insurance when it had no relevance to the issues in the case and served only to degrade defendant. Defense counsel asked the court to require the prosecutor to make a showing as to the relevance of the evidence. The prosecutor then expressed the view that it was "a viable theory that [defendant] didn't do it alone." The trial court stated that it did not see the viability of this theory and that it was of the opinion that there was no support in the evidence for any such finding. However, the court expressed the view that defendant's knowledge of the insurance policy might have some bearing upon the reasonableness of the force which defendant had used to defend herself. Defense counsel asked that the court hold the evidence pertaining to insurance to be inadmissible under section 352 of the Evidence Code and that the court strike the testimony

elicited by the prosecution on that subject. The court denied these requests.

In *People* v. *Chapman* (1975) 50 Cal.App.3d 872, 880-881 [123 Cal.Rptr. 862], it was held that pursuant to section 352 of the Evidence Code, the trial court in a criminal case should exclude evidence which merely points to a possible ground of suspicion. The evidence pertaining to the insurance policy on Gary's life appears to fall into this category. The trial court was correct in rejecting the prosecutor's suggestion that a third party assisted in the killing of defendant's husband. The record contains no evidence to support such a finding. On the other hand, the indorsement of the trial court's theory that defendant's awareness of the insurance policy might tend to show that she had used more force than necessary to repel Gary's assault upon her would set a deplorable precedent. It is a matter of common knowledge that husbands, and particularly those with children, normally carry insurance which names their wives as beneficiaries. The insurance carried by Gary, consisting of $35,000, cannot be characterized as excessive in amount. To hold that the insurance evidence was admissible in this instance would permit such evidence in any situation where an individual with insurance in any amount died at the hands of his beneficiary, regardless of the circumstances. Having in mind that the evidence in this case was such that the trial court ultimately granted a judgment of acquittal on the charges of first and second degree murder, thereby determining an absence of malice aforethought as a matter of law, we believe that the evidence of the insurance policy on Gary's life could only serve to confuse the jurors and encourage them to engage in improper speculation about a possible motive. We conclude that such evidence should have been ruled inadmissible under section 352 of the Evidence Code and that the trial court should have granted defendant's motion to strike that evidence.[3]

Defendant's final contention on appeal is that the prosecutor was guilty of prejudicial misconduct in introducing the irrelevant and damaging

[3]*People* v. *Goedecke* (1967) 65 Cal.2d 850, 860 [56 Cal.Rptr. 625, 423 P.2d 777, 22 A.L.R.3d 1213], which the Attorney General cites as authority for the admissibility of the insurance evidence, is readily distinguishable. In that case, the 18-year-old defendant murdered both his parents and his brother and sister, and the only real question for the jury was whether he was sane at the time. The California Supreme Court did not hold that the evidence that the defendant was a beneficiary under insurance policies on his father's life was properly admitted, but held only that the admission of such evidence "did not constitute prejudicial error," since it was "unlikely that the evidence of the policies affected the jury's verdicts." (P. 860.)

evidence pertaining to the insurance policy; also, in making a statement, during his closing argument to the jury, that Gary Bush did not deserve to die.

In support of her contention that the prosecutor acted improperly by introducing the subject of insurance into the trial, defendant points out that, in situations not covered by the Rules of Professional Conduct of the State Bar of California, the applicable standard to be followed is the Code of Professional Responsibility of the American Bar Association. (*Hawk* v. *Superior Court* (1974) 42 Cal.App.3d 108, 116, fn. 6 [116 Cal.Rptr. 713].) Disciplinary rule 7-106 of the latter code provides, in part, that "(C) In appearing in his professional capacity before a tribunal, a lawyer shall not: [¶] (1) State or allude to any matter that he has no reasonable basis to believe is relevant to the case or that will not be supported by admissible evidence. [¶] (2) Ask any question that he has no reasonable basis to believe is relevant to the case and that is intended to degrade a witness or other person."

In this instance, the only basis upon which the prosecutor sought to introduce the subject of insurance was the theory that a third person helped defendant murder her husband. As we have previously noted, there was no evidence in this record which would support such a theory. Accordingly, we agree with defendant that the matter of insurance was improperly introduced, and that such questions should not have been asked.

■ As for the prosecutor's statement during argument that Gary Bush did not deserve to die, we cannot agree with defendant that the prosecutor was thereby expressing his personal opinion that defendant was guilty. What the prosecutor actually said was that Gary Bush did not deserve to die "for slapping a woman." We agree with the Attorney General that it appears that, in making this statement, the prosecutor was merely drawing the jury's attention to evidence tending to suggest that defendant's stabbing of her husband was not commensurate with the force which he had used against her.

We find that the evidence in this case was very closely balanced and was at least as favorable to defendant as that in *People* v. *Torres, supra,* 94 Cal.App.2d 146, and *People* v. *Moore, supra,* 43 Cal.2d 517. Thus, we cannot say that the erroneous refusal to give defendant's proffered

instruction on prior threats and the erroneous introduction of evidence pertaining to the insurance policy was nonprejudicial.

The judgment of conviction is reversed.

Taylor, P. J., and Kane, J., concurred.