[Crim. No. 15796. Second Dist., Div. Five. Jan. 8, 1970.]

THE PEOPLE, Plaintiff and Respondent, v.
WILLIAM THOMAS BRYAN, Defendant and Appellant.

## COUNSEL

William Thomas Bryan, in pro per., and Charles M. Berg, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Howard J. Schwab, Deputy Attorney General, for Plaintiff and Respondent.

## OPINION

**FRAMPTON, J. pro. tem.\*—**

### Statement of the Case

Defendant was charged by information with the crime of robbery (Pen. Code, § 211) in count I. It was further alleged that at the time of the commission of the offense he was armed with a deadly weapon, to wit, a revolver. Count II of the information charged illegal possession of a firearm by a convicted felon in violation of section 12021 of the Penal Code. The defendant was also charged with two prior felony convictions which were separate and distinct from the felony conviction alleged as part of the substantive offense set forth in count II. One was for burglary in the County of Los Angeles on April 26, 1962, and the other was for larceny, a felony, in the County of Philadelphia, State of Pennsylvania, on January 18, 1961. It was further alleged that he suffered imprisonment in state prison upon each of such prior convictions. Defendant entered a plea of not guilty and denied the truth of the allegations of prior convictions.

On September 28, 1967, before Judge Breitenbach, a jury was impaneled and sworn. The defendant was sworn and testified, out of the presence of the jury, regarding the prior convictions. At the conclusion of this testimony, on motion of the defendant, the two separately alleged priors were stricken. The jury was returned to the courtroom and was admonished to disregard any reference to the priors stricken. At this point the defendant moved for a mistrial and the motion was granted, and the jury was discharged. On October 24, 1967, the case was again called for trial and was continued on motion of the defendant. At this time the defendant and counsel of his own choosing requested the court to appoint an investigator to help locate and subpoena a witness. This request was denied.

---

\*Retired judge of the superior court sitting under assignment by the Chairman of the Judicial Council.

On November 30, 1967, before Judge Light, the cause went to trial before a jury. The court heard evidence concerning the validity of the prior convictions and ruled that some of them could be used for the purpose of impeachment if defendant took the stand. At the conclusion of the People's case, count II of the information was dismissed in the interests of justice. The jury returned its verdict finding the defendant guilty of robbery and found it to be robbery in the first degree. The jury also found the defendant to have been armed with a deadly weapon at the time of the commission of the offense. Defendant's motion for a new trial was denied, probation was denied, and he was sentenced to state prison.

The judgment recites that the defendant was armed, as alleged in the information, at the time of the commission of the offense, and that the defendant admitted the two separately alleged prior convictions of felony charged in the information. On May 1, 1968, the date set for hearing of defendant's motion to vacate and set aside the judgment, among others, the trial court ordered the judgment amended *nunc pro tunc* by striking therefrom all reference to the two separately alleged prior felony convictions which had been ordered stricken from the information on September 28, 1967, the court stating that "the Defendant went to trial without priors alleged."

The appeal is from the judgment, from the order denying the motion for a new trial, and from the order denying probation.[1]

### Statement of Facts

Howard S. Donnell, Jr., is employed as the manager of the Chicken Delight Restaurant located at 6150 Hollywood Boulevard in the City of Los Angeles. He was working at the restaurant at the midnight hour on April 22, 1967. In the restaurant at the time was Mr. Bryan O'Connor, Miss Sherry Stone, and Mr. Edward Voight. All three were employees, but only O'Connor and Miss Stone were on duty at the time.

Miss Stone was standing behind the second counter in the restaurant, and O'Connor was at the front counter talking on the telephone. Donnell was in the pizza area making a pizza. The defendant walked into the restaurant, stood away from the counter at first, and looked down at the pizza sign located in the front area. Miss Stone asked if she could help him. The defendant replied that he wanted a small cheese pizza. Miss Stone relayed the order to Donnell.

---

[1]The orders denying the motion for a new trial and probation are not appealable orders under the circumstances here shown. The attempted appeal from such orders must, therefore, be dismissed. (Pen. Code, § 1237.)

O'Connor finished his telephone call and, not having heard the order placed with Miss Stone, asked the defendant if he could help him, wrote down the order for a small pizza and passed it on to Donnell.

Donnell, who was making pizzas at the time, noticed the defendant come into the restaurant because the latter was wearing a light beige raincoat with a tie belt and dark sunglasses, and it was not raining. Defendant walked up to the front counter where O'Connor was stationed. Donnell observed the defendant engaged in conversation with O'Connor who was standing behind the counter.

Donnell first heard shouts. He heard O'Connor say, "Oh, no you don't, not here, don't do that, no, you can't." Donnell then started for the front of the restaurant, walking around the corner towards the cash register, when Miss Stone called out, "He's got a gun."

Mr. O'Connor had closed the cash register. The defendant was seen fumbling around trying to get the register open. Finally, he opened the register, took out the bills first, and then the coins. Donnell was standing about 9 feet from the defendant at this time.

Mr. Voight observed the defendant at the counter reaching over into the cash register, taking money out of it with one hand. He held a gun in the other hand. At the same time that Donnell started coming around to the front of the restaurant, O'Connor was backing away from the register into the back room, and Miss Stone, who was directly in front of the defendant, went underneath the counter and onto the floor.

While the defendant was taking money out of the register, Donnell had an opportunity to observe and study his clothes, his appearance and his face. After taking the money the defendant left the premises and was observed by Donnell walking west on Hollywood Boulevard in the direction of Argyle. He observed the defendant walk to a point opposite the parking lot of the Broadway Tire Center, then turn left and walk into the parking lot. Donnell then drove his car to Argyle and an alley-way just south of Hollywood Boulevard where he stopped and parked his vehicle. After looking in all directions, he observed the defendant seated in a parked car. This car was headed toward Vine Street. Meanwhile, Mr. Voight had gone out in front of the restaurant and had observed some police officers across the street talking to a motorist. He informed the police as to what had happened and they left and went down El Centro Street. Voight then joined Donnell on Argyle Street near a parked car. He observed a man sitting in a car behind one of the stores that faced on Hollywood Boulevard. This man seemed to be moving around in the car. Shortly after that the man got out of the car carrying an object resembling a suitcase. The man stopped at a

loading dock directly in front of the car and it appeared that he left the object there. The man then started across another parking lot toward Hollywood Boulevard, at which time Voight followed him. Voight followed the man because he appeared to be the same person who had just robbed the restaurant. Donnell also recognized the man as the one who perpetrated the robbery. When the man left the parked vehicle, he was wearing a black sports coat, light gray pants, dark shoes and black socks. Both Donnell and Voight saw the man enter a bar called the Haunted House. The police were notified and, upon their arrival, Donnell, Voight and the police entered the Haunted House where the defendant was placed under arrest.

A cursory search of the defendant at the time of the arrest and a later search at the Hollywood police station turned up a set of keys that fit a 1960 blue Rambler which was parked in a loading area at the rear of 6260 Hollywood Boulevard. There were a large number of bills found in two pockets of the defendant's pants and in two pockets of his jacket, totaling $132. A total of about $150 was reported taken.

Myrl Thorne, a police officer for the City of Los Angeles, was in the area of the Haunted House about midnight of April 22. He found a plaid overnight case at the rear door of the building located at 6260 Hollywood Boulevard. Inside the overnight case he found a trench coat, a pair of dark sunglasses, a .38 calibre Smith & Wesson, bulldog model, five .38 calibre bullets, and $11.20 in quarters and nickels. He also found an address book.

### Defense

The defendant took the witness stand and testified in his own behalf. On direct examination he admitted that he had been convicted of a felony in the State of Pennsylvania in 1961, and of a felony in the State of California. These prior felony convictions were one and the same as those separately charged in the information, and which had been stricken by the court at the first trial.

The defendant testified in substance that on the night of April 22, 1967, at about midnight, he took some money from the Chicken Delight Restaurant on Hollywood Boulevard. He related that at 6 o'clock on the evening in question he took his wife to work and then drove to Hollywood Boulevard and Western Avenue. Thereafter, he went to see a friend of his who ran a hot dog stand on the corner. His friend was not there, but he met a girl friend there by the name of Angie Rivera. She was with a male friend whose name he did not know. As he was leaving, Angie Rivera asked him to drive her to Hollywood Boulevard and Vine Street. He had told her previously that he was going to the Haunted House, and agreed to drop her off at her destination. He drove her to the exact spot where his car

was found after he was arrested. They got out of the car and walked to Hollywood Boulevard and Vine Street. At this point they were arguing. He asked her to go to the Haunted House with him, have a few drinks, and they would discuss their differences. This resulted in a violent argument, so he just walked away from her and went to the Haunted House.

The defendant testified further, in substance, that at about 11:30 p.m. he received a telephone call at the Haunted House from Angie Rivera who told him that he should listen to her carefully and do exactly as she said. She told him that if he did not do exactly as she said, she would kill his son. She put his son on the telephone, and he said something. She told him that he was to rob the Chicken Delight Restaurant and take money from the safe, as well as the cash register. He told her that it was impossible and that he would not do it. She told him that unless he did exactly as she said, his son, as well as the defendant, would be killed. He told her that he could not do what she said. She said that "what I needed to do it with, and everything, I could find in the doorway next to my car."

The defendant testified further, in substance, that he first went back to the bar after he hung up. He was very confused at this time. Then he wrote a note on a page of the address book which the police had, tore it out of the book and handed it to a young woman seated next to him at the bar with instructions that she give it to the bartender. He then left the bar and went to his car. The note read "if I'm not back here in 15 minutes, send the police to 168 Claremont Street in Belmont Shores." This was where he lived, and this was where his son was.

Defendant testified further, in substance, that Angie Rivera only called him once. She said she wanted money. Earlier in the evening she told him that he owed her $100 that he had borrowed from her about six months previously. He knew that she was using heroin. He left the Haunted House and went to the loading dock, or doorway, where he found the gun. It was loaded, but he removed the bullets before he went to the Chicken Delight Restaurant. He also found a coat and a pair of sunglasses. He put the coat on, took the bullets out of the gun, put on the glasses, and walked down to the Chicken Delight Restaurant. He waited a few minutes outside and did not know what to do. Eventually he decided that he would go in and try to explain to these people what he was up against.

The defendant testified further, in substance, that he walked into the restaurant and stood inside the door for a few minutes. This young lady (the witness Miss Stone) hollered across the room and asked what he wanted. He said he wanted a small pizza. Several minutes later a man walked up to the table and the defendant was going to explain to him what he (the defendant) was up against, at which time he pulled out the gun in order to explain. Right away, this person started hollering upon

the sight of the gun, saying something to the effect of "no, no, no, no." When the defendant turned around, there was nobody there. "Evidently everyone had got on the floor or something." He stood there for several minutes because he did not know what to do. He then reached over and "hit the cash register." When he had talked to Angie Rivera on the telephone she had said that someone would be watching him, and if he did anything wrong he would "get [his] brains blown out." When he left the telephone and walked back to the bar at the Haunted House, he noticed the same fellow that he had seen Angie Rivera with earlier that night standing near the bar. As he walked from the Haunted House to where his car was parked, and where he found the travel case containing the gun, overcoat and glasses, he observed the same man on the other side of the street.

After he had taken the money from the cash register, the defendant related that he put the money in his pocket, picked up the gun, and walked down the street to where his car was parked. When he arrived at his car, he put everything back in the carrying case, then walked back to the Haunted House where he had been told to go by Angie Rivera. She had not told him what to do with the case and its contents so he just put it back where he had found it.

On cross-examination the defendant testified that he never really "dated" Angie Rivera but that they went out occasionally. This was the first time he had seen her since November 1966. She had called him several times during the six months thereafter. His two sons, who were 12 and 13 years of age were at home on the occasion of the robbery. He testified further that the boys were not his natural children, but were those of his "common-law wife." He did not know who the lady was that he gave the note to at the bar. He told her to give the note to the bartender and to make sure that he got it. He was not sure whether he put Belmont Shores on the note in connection with the address at which the police were to call.

Still on cross-examination, the defendant testified further that before he entered the Chicken Delight Restaurant he saw a man across the street from the restaurant who he thought had been following him. He was more afraid of being shot by the man across the street than he was of being shot by the owner of the restaurant. He did not tell the police about the threat against his son or himself until April 25, when he was booked into the county jail, at which time, he consulted with an "attorney in Las Vegas, out that way, and he told me to call the police and explain my story." He called the police department. A police officer with whom he talked said he was sorry to hear about it, took his name and the information, and told him that when he got out of jail he should come to the police department and file a complaint.

On further direct examination the defendant testified that Angie Rivera had told him that she was addicted to narcotics and that her habit cost her about $60 or $70 a day.

On further cross-examination the defendant testified that he had never seen Angie Rivera with a gun or knife on any prior occasion, and he never believed that she had possession of or access to a gun, knife or any deadly weapon; that Angie Rivera had met the children before and appeared to be friendly to them on those occasions.

### Contentions on Appeal

The defendant, through his appointed counsel on appeal, urges reversal of the judgment for the following claimed errors: (1) The action of the trial judge upon the first trial in striking the prior convictions was res judicata and binding on the court at the second trial; (2) the Pennsylvania prior conviction is constitutionally invalid; (3) the evidence sustains the defense of duress; (4) the trial judge committed prejudicial error in not disqualifying himself pursuant to a motion made under section 170, subdivision 4, of the Code of Civil Procedure; (5) the defendant was denied equal protection of the law under the Fourteenth Amendment to the United States Constitution by failure to appoint an investigator for the assistance of the defendant; (6) the court committed prejudicial error in denying defendant's motion for a certificate of probable cause and for a stay of execution of sentence pending appeal, and (7) the recitals in the judgment of conviction are improper.

The defendant, in propria persona, in his brief entitled "Appellant's Supplemental Opening Brief," urges (a) that he was denied the right of confrontation and cross-examination of the witnesses against him; (b) the impeaching priors were based upon inadmissible statements; (c) he was denied his constitutional right to have compulsory process for obtaining witnesses in his favor; (d) he was denied due process and equal protection of the law because of excessive bail fixed at the trial level; (e) the determination that defendant was ineligible for probation was erroneous because the trial judge misread and misconstrued the probation report; (f) inadmissible statements were introduced into evidence at the motion for a new trial; (g) he was denied the effective assistance of counsel in that his attorney did not discuss his case with him prior to trial.

The defendant urges that since Judge Breitenbach struck the two prior convictions in a hearing conducted after a jury had been impaneled and sworn to try the cause, and after which the trial judge, on motion of the defendant, declared a mistrial, the question of the validity, or invalidity

of such priors having been determined in favor of defendant, such ruling was res judicata as to their invalidity and was binding on the trial court, for all purposes, in the second trial. Although the prior convictions were found to be valid for purposes of impeachment at the second trial, they were deemed not to have been charged in the information so that no finding thereon was made as to their truth, and they were not used for the purpose of imposing sentence.

■ It is held that the constitutional validity of a prior conviction is a matter to be determined by the court, and not by the jury. Such issue may be raised before the trial, or at any time during trial and before the case is submitted to the jury. (*People* v. *Curtis*, 70 Cal.2d 347, 359, 360 [74 Cal.Rptr. 713, 450 P.2d 33].) The proceeding whereby such determination is made, is designated as a hearing. (*People* v. *Coffey*, 67 Cal.2d 204, 217 [60 Cal.Rptr. 457, 430 P.2d 15].) ■ The doctrine of res judicata has been applied to final orders, or orders affecting substantial rights, which have been fully litigated and from which an appeal lies. It is applied to prevent the relitigation of issues determined by a final judgment in a prior action between the same parties. (*People* v. *Joseph*, 153 Cal.App.2d 548, 551 [314 P.2d 1004]; see also *People* v. *Van Eyk*, 56 Cal.2d 471, 477 [15 Cal.Rptr. 150, 364 P.2d 326], and *People* v. *Prewitt*, 52 Cal.2d 330, 339-340 [341 P.2d 1]; see also, *People* v. *Coyle*, 88 Cal.App.2d 967, 973-974 [200 P.2d 546].)

■ In the case at bench, the order striking the prior convictions at the first trial was a nonappealable order. The reasons for striking the priors are not given or shown by the minutes of the court. After the order was made striking the priors, the defendant moved for a mistrial and the motion was granted. ■ The granting of a motion for a mistrial is tantamount to a holding that there was no trial. (*In re Alpine*, 203 Cal. 731, 742-743 [265 P. 947, 58 A.L.R. 1500].) ■ The minutes with respect to granting the mistrial contain no limitation as to what portion of the proceedings, held up to that point, the order applied. In any event, the order granting the mistrial prevented the rendition of a final judgment at the first trial. Under these circumstances, we are of the opinion that the order striking the prior convictions, made at the first trial, was not res judicata as to their validity and was not binding on the trial court at the second trial. (*People* v. *Burke*, 47 Cal.2d 45, 49-51 [301 P.2d 241]; *People* v. *Coyle*, 88 Cal. App.2d 967, 973-974 [200 P.2d 546].) Furthermore, the trial judge at the second trial indicated to the defendant's counsel that he would not allow the prior convictions to stand for the purpose of increasing the punishment in the event of conviction, but that he felt it was proper, upon proof

of the validity of such priors, to allow the district attorney to use them for the purpose of impeachment in the event that the defendant took the stand.

The defendant contends that the Pennsylvania prior felony conviction of 1961 is invalid because the docket sheet does not show that he was represented by counsel at his felony preliminary examination.

The evidence discloses that at the trial level the defendant entered a plea of guilty, and at this time he was represented by counsel.

Whether or not the Pennsylvania conviction is valid depends on whether the Pennsylvania preliminary hearing was a critical stage of the proceeding necessitating the presence of counsel as discussed in *Hamilton* v. *Alabama* (1961) 368 U.S. 52, 53 [7 L.Ed.2d 114, 115, 82 S.Ct. 157] and *White* v. *Maryland* (1963) 373 U.S. 59, 60 [10 L.Ed.2d 193, 194, 83 S.Ct. 1050].

In California, although the presence of counsel or an intelligent waiver is required in a felony preliminary hearing, such right being provided both by the California Constitution and by statute (*In re Johnson,* 62 Cal. 2d 325, 329 [42 Cal.Rptr. 228, 398 P.2d 420]), it is not deemed to be a critical stage of the proceedings under federal constitutional standards requiring representation by counsel. It is considered, under federal standards, as a mere inquest held to determine probable cause. (*Wilson* v. *Harris,* 351 F.2d 840, 845; *Wells* v. *California,* 234 F.Supp. 467, 470; cf. *People* v. *Harris,* 67 Cal.2d 866, 869, fn. 1 [64 Cal.Rptr. 313, 434 P.2d 609].)

The preliminary hearing in Pennsylvania serves the same purpose as such proceeding serves in California. The Pennsylivania preliminary hearing is held not to be a critical stage of the criminal proceedings necessitating the presence of counsel unless a plea is entered at that stage or something else occurs at the hearing which later results in prejudice to the defendant. (*Commonwealth* ex rel. *Firmstone* v. *Myers,* 431 Pa. 628, 631-632 [246 A.2d 371]; *Commonwealth* ex rel. *Maisenhelder* v. *Rundle,* 414 Pa. 11 [198 A.2d 565]; *Commonwealth* ex rel. *Mount* v. *Rundle,* 425 Pa. 312 [228 A.2d 640, 645]; *Commonwealth* ex rel. *Mumford* v. *Cavell,* 423 Pa. 280 [223 A.2d 852]; *Commonwealth* ex rel. *Finnie* v. *Russell,* 422 Pa. 313, 316 [220 A.2d 796]; *Commonwealth* ex rel. *Parker* v. *Myers,* 414 Pa. 427, 429 [200 A.2d 770].) In Pennsylvania, a plea of guilty under the auspices of counsel waives any right to question proceedings prior to the entering of the supervised plea. (*Commonwealth* ex rel. *Parker* v. *Myers, supra,* 414 Pa. 427, 429 [200 A.2d 770]; *Commonwealth* ex rel. *Walls* v. *Rundle,* 414 Pa. 53, 55-56 [198 A.2d 528].)

In the case at bench, the record does not show that the defendant entered any plea at the Pennsylvania preliminary hearing; a fact which he concedes. However, he contends that he was prejudiced because it is conceivable that

he was unable to cross-examine the witnesses by not having his counsel present.

The record does not show that the defendant took the witness stand at the preliminary hearing. It shows that four prosecution witnesses testified. The mere fact that prosecution witnesses testify at a felony preliminary hearing and that the defendant might have cross-examined these witnesses better if he had counsel does not make that hearing a critical stage in the proceedings. Since the defendant could cross-examine these witnesses with counsel later at the trial, the benefit to be obtained by cross-examining such witnesses at the preliminary hearing is too conjectural to constitute a deprivation of a federal constitutional right. (*Wilson* v. *Harris, supra,* 351 F.2d 840, 845; *United States* v. *Reincke,* 333 F.2d 608, 609, 613.) We are of the opinion that the record sustains the trial court's finding that the Pennsylvania prior conviction was valid, and it was not error to permit the use of such prior for the purpose of impeachment.

■ The defendant urges that his testimony sustains the defense of duress. "All persons are capable of committing crimes except those belonging to the following classes: Eight. Persons (unless the crime be punishable with death) who committed the act or made the omission charged under threats or menaces sufficient to show that they had reasonable cause to and did believe their lives would be endangered if they refused." (Pen. Code, § 26, subd. Eight.) At the defendant's request, the court instructed the jury in the language of CALJIC 74-F Revised. This instruction correctly advised the jurors that if they found that the defendant committed the offense charged while acting under duress, he should be found not guilty. Assuming that the defendant's version of his conduct, if believed, would sustain the defense of duress, the jury was not bound to accept such version. (*People* v. *Bates,* 256 Cal.App.2d 935, 939 [64 Cal.Rptr. 575]; *People* v. *Mc-Auliffe,* 154 Cal.App.2d 332, 340 [316 P.2d 381].) The verdict of guilty constituted a rejection of the defendant's story that he committed the crime while acting under a threat to his life or to the life of the son of his common-law wife, such as would constitute an immediate and imminent danger to either of them. (See *People* v. *Lewis,* 222 Cal.App.2d 136, 141 [35 Cal.Rptr. 1].)

■ The defendant urges that the trial judge should have disqualified himself pursuant to a motion under section 170, subdivision 4 of the Code of Civil Procedure.[2]

---

[2]Section 170, of the Code of Civil Procedure reads as follows: "No justice or judge shall sit or act as such in any action or proceeding:

". . . . . . . . . . . . . .

"4. When, in the action or proceeding, or in any previous action or proceeding involving any of the same issues, he has been attorney or counsel for any party; or

The record discloses that on November 24, 1964, Judge pro tem. Leslie W. Light, who at that time was a deputy in the office of the District Attorney of Los Angeles County, appeared in Department West B of the superior court at which time sentence to state prison was placed in effect after the defendant's conviction on appeal had been affirmed. This case was the basis of the prior conviction of violation of section 10851 of the Vehicle Code suffered in February 1963, and which was charged as a prior conviction as part of the offense charged in count II of the information here. As heretofore pointed out, this count of the information was dismissed in the interests of justice at the conclusion of the People's case. The record discloses further that Judge Light had not prosecuted the case to conviction nor had he participated in the appeal which resulted in affirmance of the judgment. He was simply in the courtroom to take care of the many matters calendered on that date and took no part in the reaffirmance of the sentence originally pronounced. Judge Light stated that he knew nothing about the case at that time (time of sentence), and knew nothing about the case at this time (time of trial of present action). The contention that Judge Light was disqualified under the foregoing provision of the Code of Civil Procedure, under the circumstances here shown, is without merit.

■ The defendant urges that he was denied equal protection of the law by the refusal of Judge Breitenbach, at the first trial, to appoint an investigator to aid him in his defense.

In support of this contention the defendant cites and relies on *Whittington* v. *Gaither,* 272 F.Supp. 507, which implies that the defendant there, being a pauper, and having witnesses outside the State of Texas who could furnish him with an alibi, was entitled to an investigator at the expense of the state to interview such witnesses. This case was reversed in *Texas* v. *Whittington,* 391 F.2d 905, 907, wherein the circuit court held that "Whittington was denied nothing by Texas law or procedure," thus, impliedly holding that the State of Texas was not obligated, in order to satisfy the equal protection of the law requirement of the federal Constitution, to appoint an investigator for the defendant at the expense of the state.

Here, the defendant was entitled to the services of the sheriff, at the expense of the state, to subpoena witnesses, within the state, in his behalf. (Cal. Const., art. I, § 13.) He was also entitled, at the expense of the state, to compel the attendance of witnesses outside the state in those states which have adopted the "Uniform Act to Secure the Attendance of Witnesses from without the state in Criminal Cases," or have such witnesses examined on

---

when he has given advice to any party upon any matter involved in the action or proceeding; or when he has been retained or employed as attorney or counsel for any party within two years prior to the commencement of the action or proceeding."

commission. (Pen. Code, §§ 1334-1362.) We are unaware of any law, and defendant has cited none, that imposes the burden on the state to furnish to a defendant represented by privately retained counsel, without any showing of indigency, a private investigator to aid him in the preparation of his defense. The contention is without merit.

■ The defendant argues that the court committed prejudicial error by not granting his motion, made subsequent to judgment, for a certificate of probable cause and stay of execution attendant thereto pending appeal. He does not make it clear how this refusal affects the merits of the case on appeal.

Section 1243 of the Penal Code authorizes the trial court in a case, such as the one at hand, to stay execution of the judgment. The granting of such stay, however, rests in the discretion of the court. Defendant contends, however, that the question of the validity of the Pennsylvania prior conviction presented a debatable question which would require extended consideration (see *People* v. *Simpson,* 65 Cal.App.2d 15 [151 P.2d 738]), and therefore it was an abuse of discretion to deny a stay of execution. We find no merit in this contention. (See *People* v. *Santos,* 134 Cal.App. 227, 228-229 [25 P.2d 235].)

■ Next, the defendant urges that the recital in the judgment "and that defendant was armed as alleged," it having been charged that he was armed with a deadly weapon, to wit, a revolver, at the time of the commission of the robbery, subjects him to double punishment under section 12022 of the Penal Code, and which is proscribed by section 654 of the Penal Code. It is held to be error to include in the judgment a recital that the defendant was armed with a deadly weapon at the time of the commission of the offense where the use of the weapon is an integral part of the crime committed. (*People* v. *Floyd,* 71 Cal.2d 879 [80 Cal.Rptr. 22, 457 P.2d 862].) In the case at bench the use of the revolver was an integral part of the crime of robbery of which the defendant stands convicted. Therefore, the recital in the judgment that he was armed at the time of the commission of the offense must be modified.

In addition to the foregoing contentions, counsel states that in a communication received from the defendant, the latter requests this court to review the following issues: (1) The jurors observed the defendant chained with three other persons who were in custody; (2) defendant was not advised of his constitutional rights prior to the taking of a handwriting exemplar; (3) defendant's motion for a new trial should have been granted, especially in view of the court appearing to grant the motion and then denying the motion.

■ There is nothing in the record to support the defendant's contention that he was observed by the jury while chained to other persons who were in custody, except a hearsay statement by his counsel made to the court as follows:

"MR. HAMILTON: One other matter, your Honor. I realize the facilities of this building are rather limited. The defendant informs me the deputy brings him to court chained with three other fellows, and the jurors see him in this condition. It seems to me it is detrimental to the case of the defendant.

"THE COURT: Well, ordinarily speaking, hereafter I am sure that the defendant will be brought to court at a time that the jury will not be present, and the defendant should be brought to court with the rest of the prisoners, which is prior to 9 a.m., and we will undoubtedly not ask the jury to return any earlier than 9:30, so there shouldn't be any further contact.

"Insofar as the fact that the jurors may see the defendant in custody, it does appear quite obvious that he is in custody, and of course, I have instructed the jury that the mere fact that he has been arrested and brought here is not to be considered as indicating that he is more likely to be guilty than innocent.

"I will ask the bailiff to do what can be done to avoid exposing the defendant to the jurors in the condition of being manacled, but the custody requirements are the sheriff's responsibility, and really I cannot do too much about it. They have their rules and regulations.

"But, Mr. Bailiff, insofar as possible, please try to avoid exposing the defendant while manacled to the view of the jurors in this case.

"THE BAILIFF: Yes, your Honor.

"MR. HAMILTON: Thank you, your Honor."

No further reference to the matter was made throughout the trial and no objection was interposed which raised the question. In this state of the record the objection may not be raised for the first time on appeal. (*People v. Deveny,* 112 Cal.App.2d 767, 769-770 [247 P.2d 128].)

■ As to the taking of a handwriting exemplar without advising defendant of his constitutional rights, it is held that such advice is not a prerequisite to the taking of such an exemplar. (*People* v. *Graves,* 64 Cal. 2d 208, 210-211 [49 Cal.Rptr. 386, 411 P.2d 114]; *People* v. *King,* 273 Cal.App.2d 418, 422 [78 Cal.Rptr. 146].)

The defendant's claim that a new trial should have been granted because, as he asserts, the trial court appeared to grant, and then denied, the motion is without support in the record. The granting or denial of a new trial is a matter that rests in the sound discretion of the trial court. (*People* v. *Greenwood,* 47 Cal.2d 819, 821 [306 P.2d 427].) No abuse of discretion is shown here.

 In the defendant's pro. per. supplemental brief he urges that he was denied the right of confrontation and cross-examination of witnesses against him. This argument is based upon his claim that he had the right to cross-examine the persons whose names appeared on the documents used to establish the truth of his prior convictions.

These documents did not contain any testimony dealing with the crime of which he stood convicted. He had the right to confront the witnesses against him, if any, at the prior trials. Therefore, his right of confrontation was not violated by use of the documentary proof that he was convicted. Section 969b of the Penal Code provides the method of proof of a prior. Such method of proof was used here. There was no attack upon the sufficiency of the documents made at the trial level, such as is made here. *Pointer* v. *Texas,* 380 U.S. 400 [13 L.Ed.2d 923, 85 S.Ct. 1065], broadly equates the constitutional right of confrontation with the rule against the admission of hearsay evidence. A public document is hearsay with respect to the truth of its contents. *Pointer* recognizes that not every kind of hearsay falls "within the scope of the constitutional rule requiring confrontation." (380 U.S. at p. 407 [13 L.Ed.2d at p. 928].) We are of the opinion that to follow the procedure of proof of a prior conviction of felony as authorized by section 969b of the Penal Code does not violate any constitutional right of the defendant. (*People* v. *Coyle,* 88 Cal.App.2d 967, 978 [200 P.2d 546]; *People* v. *Purcell,* 22 Cal.App.2d 126, 132 [70 P.2d 706].)

Next, the defendant urges that the impeaching priors were based on statements obtained in violation of the rule laid down in *People* v. *Dorado,* 62 Cal.2d 338 [42 Cal.Rptr. 169, 398 P.2d 361]. There is nothing in the record to support this contention.

The defendant's claim that he was denied his constitutional right to have compulsory process for obtaining witnesses in his favor is based upon the court's refusal to appoint a private investigator at the expense of the state to aid in locating and subpoenaing witnesses. This point has been commented on hereinabove, and no further comment is necessary.

 Next, the defendant claims that he was denied due process and equal protection of the law because of excessive bail fixed at the trial. He argues that his bail was fixed on the basis of a prior conviction (1963 con-

viction of violation of § 10851, Veh. Code) which the trial court in the present action found to be constitutionally infirm.

At the time of the commission of the robbery here, the defendant was on parole from state prison after conviction and sentence for the 1963 conviction of violation of the Vehicle Code. A parole hold was placed against him and bail thereon was fixed at $30,000. Thereafter the trial court ruled that this prior conviction could not be used for the purpose of impeachment because the People had not established that when the defendant in the prior action had asked that the public defender be discharged and that he be allowed to proceed in propria persona, the trial judge had made the appropriate inquiries to ascertain whether an intelligent waiver had been made. This ruling was simply a ruling suppressing evidence and was tantamount to a ruling sustaining an objection to the admissibility of evidence. (*People* v. *Beasley,* 250 Cal.App.2d 71, 77 [58 Cal.Rptr. 485]; *Saidi-Tabatabai* v. *Superior Court,* 253 Cal.App.2d 257, 266 [61 Cal. Rptr. 510].) This ruling of the trial court on the admissibility of the prior conviction for the purpose of impeachment was in no sense a judgment declaring such prior conviction to be a void judgment. It was not improper for the judge to consider this prior conviction in connection with setting bail.

■ The defendant contends that the determination that he was ineligible for probation was erroneous because the trial judge misread the probation report.

In his pro. per. brief the defendant lists 16 contacts with the criminal law dating from September 23, 1957. Some of these contacts relate to proceedings when the defendant was a juvenile. Some relate to arrests where no disposition by sentence is shown. The prior conviction for larceny in the State of Pennsylvania, and the prior convictions for burglary and for violation of section 10851 of the Vehicle Code suffered in California are also shown. The defendant argues that since the larceny and burglary convictions were stricken from the information at the first trial, and since the Vehicle Code violation was held to be constitutionally infirm and therefore inadmissible for the purpose of impeachment, it was prejudicial error to consider them in passing on his eligibility for probation.

At the outset, the defendant, having been convicted of robbery accomplished by his use of a deadly weapon, was not eligible for probation, absent a showing that his case was of such unusual character that the interests of justice would demand a departure from the declared policy of the Legislature. (Pen. Code, § 1203.) Also, for reasons hereinbefore stated, the trial judge had the right to consider the defendant's prior felony con-

viction record. There is no showing whatever here that the trial court abused its discretion in denying probation.

■ Defendant's contention that statements obtained from him in violation of the rule laid down in *Miranda* v. *Arizona,* 384 U.S. 436 [16 L.Ed. 2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974], were used against him on his motion for a new trial, finds no support in the record. He refers to statements made by him to Officer Stein. The record discloses that Officer Stein first advised the defendant of his *Miranda* rights at the time of arrest at the Haunted House at which time the defendant stated that he understood his rights. At this time, after noticing numerous bills in four of the defendant's pockets, Officer Stein asked him how much money he had, if he knew. The defendant stated that he knew exactly how much money he had, "but he'd be damned if he'd tell me." The next conversation between Officer Stein and the defendant occurred at the Hollywood police station at which time the defendant denied having perpetrated the robbery. The foregoing testimony was elicited at the trial which was concluded on December 5, 1967. Defendant's motion for a new trial was heard on March 1, 1968. At this hearing the minutes show that Officer Stein was called as a witness on behalf of the defendant. What testimony was elicited from Officer Stein at this time is not in the record before us, and the defendant has failed to point out, by reference to the record, just what statements he claims were admitted against him at the time of the hearing on the motion for a new trial which he urges were in violation of his constitutional rights.

■ Lastly, the defendant raises the much abused and wholly unsupported claim that he was denied the effective assistance of counsel in his defense in that his attorney did not discuss his case with him at all prior to trial. This naked assertion finds no support in the record and deserves no comment here. However, we will say that the entire record at the trial level discloses that the defendant was effectively represented by competent counsel of his own choice.

The judgment is modified by striking therefrom the finding on line four of the second paragraph "and that defendant was armed as alleged," and by inserting in lieu thereof "that at the time of the commission of the offense, sections 3024 and 12022 of the Penal Code were inapplicable, but the defendant was armed at the time of the commission of the offense with a deadly weapon, to wit, a revolver, within the meaning of section 1203, Penal Code." (*People* v. *Floyd,* 71 Cal.2d 879, 884 [80 Cal.Rptr. 22, 457 P.2d 862].) As so modified, the judgment is affirmed.

Kaus, P. J., and Reppy, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied March 4, 1970.