[Crim. No. 42546. Second Dist., Div. One. Jan. 31, 1984.]

THE PEOPLE, Plaintiff and Respondent, v.
RICHARD PENA, Defendant and Appellant.

[Crim. No. 43803. Second Dist., Div. One. Jan. 31, 1984.]

In re RICHARD PENA on Habeas Corpus.

464

COUNSEL

James A. Goldstein for Defendant and Appellant and Petitioner.

John K. Van de Kamp, Attorney General, Norman H. Sokolow and Howard J. Schwab, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**SPENCER, P. J.—**

### INTRODUCTION

Defendant Richard Pena (Pena) appeals from a judgment of conviction and petitions for a writ of habeas corpus on the same judgment. Defendant was originally charged by information with murder in violation of section 187 of the Penal Code and with use of a firearm within the meaning of Penal Code sections 12022.5 and 1203.06, subdivision (a)(1).

Following a jury trial, defendant was convicted of voluntary manslaughter in violation of Penal Code section 192, subd. 1; the jury also found true the allegation defendant had personally used a firearm within the meaning of Penal Code sections 12022.5 and 1203.06, subdivision (a)(1).

### STATEMENT OF FACTS

Based upon the testimony of six witnesses, the People established that Frank Ambrosio (Ambrosio) had entered the bar area of the Mexican Village restaurant on February 24, 1978, sometime between 10 and 10:30 p.m. He walked at a normal pace toward defendant and a group of men who were standing at the bar; defendant stood with his back toward the bar. Prior to Ambrosio's entry, the men had glanced repeatedly toward the door. Am-

brosio walked with his hands at his sides; he was smiling. He patted one of the men who had been watching the door. Ambrosio and defendant appeared to be talking. A loud sound was heard; Ambrosio fell. The entire incident from the time Ambrosio entered the bar until the shooting took between 30 and 45 seconds.

None of the witnesses observed any violence other than the shooting. Prior thereto, defendant was heard to say to Ambrosio, "Don't say anymore. Don't say anymore." Defendant was seen holding a gun and a "black-like business card case."

Abel Olivares (Olivares), owner of the Mexican Village restaurant, testified defendant had been in the restaurant to settle his account earlier in the evening; he visited the restaurant approximately twice per month. Defendant returned with friends at approximately 9 p.m. Olivares was in the dining room at 10:30 p.m.; he entered the bar area after hearing a shot. He removed a gun from defendant's hands, put it on the floor and then devoted 10 to 20 seconds to Ambrosio's care. When Olivares looked up, defendant and his friends had departed.

Abel Armas, captain of police, Los Angeles Police Department, was dining in the Mexican Village the night Ambrosio was shot. He heard the shot and observed defendant "walk quickly away" from the area. Defendant exited from the kitchen area. Although he did not appear to be limping, defendant was "slightly hunched." Once outside the restaurant, defendant was joined by another man; defendant used a key to open the door of a blue Lincoln Continental. Both men entered the car; they drove off rapidly.

Lieutenant Robert Kurowski, assigned to the Rampart Division of the Los Angeles Police Department, arrived at the restaurant shortly after the shooting. He found the deceased on the floor with a revolver within a foot or two of his body. The weapon, a Smith and Wesson .44 magnum, contained five live and one expended round of magnum hollow point ammunition.

Expert testimony established defendant stood 5 feet 7½ inches tall and weighed approximately 160 pounds; Ambrosio was 6 feet 1 inch tall and weighed 241 pounds on the day of his death. According to Arleigh McCree, a weapons expert, Pena's gun had been fired from inside its zippered case.

### DEFENSE

Richard Pena owned an auto body shop and also worked as an investigator for a law firm; he had known Frank Ambrosio, Jr., for some time, had travelled to Costa Rica with Ambrosio and had been best man at Ambrosio's

wedding. Pena considered Ambrosio a violent person. He had seen Ambrosio become angry at two young girls and "beat the hell out of them bad"; Ambrosio "kicked them, threw them on the floor, hit them with a bottle of Chivas Regal Scotch." Although Pena attempted to stop the beating, he was unable to do so.

Ambrosio told Pena he had committed "a few armed robberies and was charged with assault with a deadly weapon," that he had killed someone while out joy-riding and that "he almost killed a black man because he was talking to a white waitress. . . ." In addition, Pena was aware the law firm for which he worked had represented Ambrosio on a charge of assault with a deadly weapon. While at the firm's office, Pena heard Ambrosio say "that he beat up two guys at the Candelarea. Sent them to the hospital." On several occasions, Pena saw Ambrosio carrying a weapon; he was aware the Cuban community considered Ambrosio a "bad cat."

Defendant hired employees who had previously worked for Ambrosio to work for him at his auto body shop; he had heard Ambrosio was angered by his action. Isaac Perez, Pena's brother-in-law, was told Ambrosio claimed Pena had stabbed him [Ambrosio] in the back and he was going to get even one day.

In 1977, Ambrosio called Pena and asked him to guarantee bail bonds for two individuals; Pena did so. Neither individual appeared in court. The bail bondsperson called and informed Pena he would have to pay for the non-appearances. Defendant called Ambrosio. He told Ambrosio to pay the bonds, but Ambrosio refused, saying "I [sic] not going to pay for it. You pay for it, you son-of-a-bitch. If you want the money, go and get a gun and come down and get your money. Better yet, don't come down. I am going to go out and look for you."

Pena was stunned. He stayed home for three days; afterwards he carried a .44 magnum revolver wherever he went. He was frightened; he knew "what [Ambrosio] was capable of doing." Pena was aware that Ambrosio was a karate expert.

One of his employees told him, "I know what happened. Frank Dennis told me. You better start carrying a gun. Don't let him get close to you."

Ambrosio called Pena and said, "Be sure to look behind every time you turn around." When he heard that, Pena felt "shaky and my stomach cramped."

Jesse Halpern (Jesse), Pena's attorney/employer, had known Pena for approximately 12 years. On February 23 or 24, Pena arrived at the law

office with a satchel containing his gun. Pena explained he was carrying it because Ambrosio had threatened his life; he took the threat seriously and felt he had to carry the gun for protection. Pena appeared "quite upset." He told Jesse "Ambrosio knew where he lived, knew where he worked, knew where he went and he didn't feel that there was any way that he could avoid him."

Russell Halpern (Russell), Pena's other employer, also knew Ambrosio; he was aware Ambrosio had earned a black belt in karate. Russell testified Ambrosio's "reputation was that he would engage in many fights; that he was very violent." After Pena explained his reason for carrying a gun, Russell called Ambrosio; Pena was able to hear the conversation on a speaker phone.

Russell began by saying, "Frank, what's wrong between you and Pena? What's going on?"

Ambrosio answered, "Nothing."

Russell responded, "What do you mean, nothing? He just left the office with a gun in his hands, running. He was going over your place."

After Ambrosio stated, "God, I am not ready for this bastard," Russell explained he was joking. Ambrosio responded, "Well, it doesn't make any difference. Tell the ------------ I am ready for him. I am waiting for him." Ambrosio added words to the effect, "I'll be looking for him. So, tell him to be ready."

According to Russell, Ambrosio's voice "would become angrier, more irritated or agitated"; he referred to Pena by using a vulgarity. Pena appeared physically disturbed as he listened to the conversation. He left the law offices and returned to his body shop.

An employee at Pena's body shop attempted to take defendant's gun; Pena said, "I cannot be without a gun. That's my life." The gun was returned to him.

At approximately 9 p.m. on February 24, 1978, Pena and friends went to the Mexican Village restaurant; he parked his car in front of the restaurant. Pena sat at barstool number eight; he saw Ambrosio come through the door. Pena had the magnum in its carrying case; Ambrosio came straight toward Pena and stopped directly in front of him, two or three feet away. Pena had grabbed the gun; Ambrosio's hands were held in front of him.

Ambrosio said something like, "You better draw faster than that." Pena believed his life was in danger; he believed Ambrosio had a gun, for he thought Ambrosio carried one at all times. He testified at trial that Ambrosio "attacked me. Came forward." Pena tried to push Ambrosio away; the gun was in Pena's left hand. Pena "pushed him away with both hands." Pena hit him either on the chest or on the forehead; Ambrosio may have kicked Pena. The barstool was knocked over. Pena perceived Ambrosio on top of him; the gun went off against Ambrosio's body.

Pena testified to the following: He did not intend to kill or maim Ambrosio; he intended only to defend himself. The owner of the restaurant and a busboy ushered Pena out of the restaurant; he got in his car and drove away. Pena called Jesse Halpern; he said he had just shot Ambrosio, "that Ambrosio had come through the door and walked directly towards him and said something to him, and that he had taken the gun out and it had gone off."

Jesse told Pena to meet him at a restaurant across from the Halperns' law office. Russell and Jesse met Pena at the restaurant shortly thereafter. Pena "appeared to be very upset, appeared to be like someone who was in shock." Russell noted Pena was "visibly shaking. Visibly saddened."

Pena stated Frank Ambrosio had come into the restaurant and walked up to him; he reached for the gun, and Ambrosio said something to the effect, "You better draw faster than that" and then lunged at him. Defendant heard the gun go off but didn't know how or why it went off. After meeting with the Halperns, Pena met with his family. He surrendered to police shortly thereafter.

At trial, numerous witnesses testified to having seen Pena carrying a gun prior to February 24; all testified that Pena had explained he was carrying the gun due to fear and concern for his safety. Danielo Perez testified that Ambrosio was "a mean fighter." Juvenal Castro told of several occasions on which he had observed Ambrosio fighting; he recalled one incident when "somebody stepped on his foot and he just turned around and knocked the guy out." On another occasion, Castro saw Ambrosio grab "a glass that was sitting on the table and just hit the guy in the face with the glass."

PROCEDURAL BACKGROUND

Defendant's first trial ended on October 29, 1979; a mistrial was declared as the jury was unable to reach a unanimous decision. Eleven jurors voted not guilty; one voted guilty. The case was dismissed on December 18, 1979, on the grounds that defendant had once been in jeopardy. On March 3, 1981, however, the Second Appellate District Court of Appeal reversed the

dismissal and remanded the case for a new trial. The California Supreme Court denied defendant's petition for hearing on the matter.

On October 16, 1981, the jury at defendant's second trial found defendant guilty of voluntary manslaughter in violation of Penal Code section 192, subdivision 1. The jury also found defendant had used a firearm within the meaning of Penal Code sections 12022.5 and 1203.06, subdivision (a)(1). The jury was polled; after each juror indicated the announced verdict was his or her verdict, the jury was dismissed.

Defendant's counsel expressed concern about juror misconduct. An investigation into the matter commenced; a hearing was held January 20, 1982. The court found allegations of juror misconduct true and declared a mistrial on the grounds the verdict had not been unanimous and a verdict, therefore, had not been rendered. After denying defendant's motion for new trial, however, the court specifically held that defendant could be retried for murder.

On February 10, 1982, the trial court rejected defendant's plea of once in jeopardy to the crime of murder in the first and second degree. On March 15, 1982, the Second Appellate District Court of Appeal issued a peremptory writ of mandate and prohibition directing the trial court to accept defendant's plea of once in jeopardy tendered on February 10, 1982, and prohibiting defendant's further trial for murder either in the first or second degree.

On March 19, 1982, the trial court vacated its previous order which had rejected defendant's plea of once in jeopardy and accepted defendant's plea to once in jeopardy for the crimes of murder in the first and second degree. After the court denied defendant's renewed motion for new trial, it vacated its order of January 20, 1982, granting a mistrial and reinstated the jury verdict finding defendant guilty of the crime of voluntary manslaughter in violation of Penal Code section 192, subdivision 1, as well as the use allegation within the meaning of Penal Code sections 12022.5 and 1203.06, subdivision (a)(1).

Defendant's petition for alternative writ of prohibition/mandate, filed with the Court of Appeal April 2, 1982, was denied on April 8, 1982. The appellate court noted, "On recording of verdict, no mistrial could be granted." A similar petition was denied by the California Supreme Court on April 19, 1982.

Defendant's renewed motion for new trial was denied by the trial court on May 20, 1982. Defendant was sentenced to the term imposed by law.

## CONTENTS

*On Appeal*

### I

Defendant contends the court erroneously refused to instruct the jury that his actions may have been justified by threats made against him by the deceased.

### II

Defendant also contends the constitutional prohibition against double jeopardy precludes renewed prosecution on charges of either murder I or II.

### III

Defendant asserts the trial court abused its discretion by refusing his motion for a new trial.

### IV

Finally, defendant avers determinations made by the trial court with respect to the introduction of certain evidence were erroneous.

*On Habeas Corpus*

### V

Defendant contends he was denied a fair trial by virtue of juror misconduct.

## DISCUSSION

### I

■ Defendant characterizes the court's refusal to instruct the jury, on the effect of his knowledge of threats made against him by the deceased, as reversible error. We agree.

■ A jury is entitled to instructions pertaining to the particular facts of the case being tried. (*Borenkraut* v. *Whitten* (1961) 56 Cal.2d 538, 545 [15 Cal.Rptr. 635, 364 P.2d 467].) Defendant's fate, therefore, should not rest

on abstract generalizations. (*Self* v. *General Motors Corp.* (1974) 42 Cal.App.3d 1, 10 [116 Cal.Rptr. 575].) ■ Rather, defendant was entitled to a jury instruction regardless of how remote or incredible the theory if " 'evidence deserving of any consideration whatsoever' " existed in support thereof. (*People* v. *Sam* (1969) 71 Cal.2d 194, 211 [77 Cal.Rptr. 804, 454 P.2d 700], quoting from *People* v. *Carmen* (1951) 36 Cal.2d 768, 773 [228 P.2d 281].) ■ The adequacy of instructions given, therefore, will be determined from our examination of the entire charge of the court. (*People* v. *Wingo* (1973) 34 Cal.App.3d 974, 979 [110 Cal.Rptr. 448].)

■ Several cases have addressed the necessity to proffer an instruction virtually identical to that requested by defendant. (*People* v. *Bush* (1978) 84 Cal.App.3d 294, 304 [148 Cal.Rptr. 430]; *People* v. *Moore* (1954) 43 Cal.2d 517 [275 P.2d 485]; *People* v. *Bradfield* (1916) 30 Cal.App. 721 [159 P. 443].) From them it is apparent that an instruction on the effect of antecedent threats known by a defendant is required where evidence establishes both threats of death or great bodily harm made by the deceased against the defendant and the defendant's belief and reliance thereon as influencing or justifying his actions. (*People* v. *Bush, supra,* 84 Cal.App.3d 294, 304; *People* v. *Torres* (1949) 94 Cal.App.2d 146 [210 P.2d 324]; *People* v. *Bradfield, supra,* 30 Cal.App. 721.) ■ Whether defendant has personally perceived threats or has been informed of threats by others is irrelevant so long as his belief in the danger represented by those threats is both reasonable and honest. The jury should be so instructed where evidence reasonably supports two interpretations, i.e., that defendant was either the aggressor or the victim of fear induced by the deceased's threats or actions. (*People* v. *Moore, supra,* 43 Cal.2d 517.) The error is presumed prejudicial, requiring reversal. (*People* v. *Bush, supra,* 84 Cal.App.3d 294; *People* v. *Torres, supra,* 94 Cal.App.2d 146.)

■ The fact that the jury was instructed with respect to the propriety of concluding defendant's actions were justified by his perception of imminent danger or great bodily harm is insufficient to mitigate the omission. Absent instruction with respect to the effect of prior threats, jurors could believe they were precluded from considering the effect of prior threats on defendant's perception of his *immediate* danger. (*People* v. *Bush, supra,* 84 Cal.App.3d 294; *People* v. *Torres, supra,* 94 Cal.App.2d 146.)

Although prosecuted for murder, defendant sought to excuse and justify his action by his belief that self-defense was necessary. ■ Inasmuch as defendant was convicted of voluntary manslaughter, we can assume the jury viewed his belief as *unreasonable,* for "[a]n honest but *unreasonable* belief that it is necessary to defend oneself from imminent peril to life or great bodily injury negates malice aforethought, the mental element necessary for

murder, so that the chargeable offense is reduced to manslaughter." (*People v. Flannel* (1980) 25 Cal.3d 668, 674 [160 Cal.Rptr. 84, 603 P.2d 1], emphasis added.) ■ Had the jury concluded defendant's belief was both honest and reasonable, it would have excused defendant's actions and rendered a verdict of not guilty. (*Id.*, at p. 675; *People v. Best* (1936) 13 Cal.App.2d 606, 610 [57 P.2d 168].)

The *reasonableness* of defendant's belief, however, is precisely the issue addressed by defendant's proffered instruction. ■ The jury must take defendant's knowledge of uncontradicted antecedent threats into consideration in its determination of whether " 'defendant acted in a manner [in] which *a reasonable person* would act in protecting his own life or bodily safety.' " (*People v. Moore, supra*, 43 Cal.2d 517, 528, quoting from *People v. Torres, supra*, 94 Cal.App.2d 146, 151-153; italics original.) ■ Absent a clear instruction to consider defendant's knowledge of the uncontradicted antecedent threats made by Ambrosio to him and to others about him, we cannot be sure jurors did not construe instructions which were proffered as narrowing the scope of facts and circumstances which they were entitled to consider to only those perceived by any other "reasonable man" approached by Ambrosio while sitting in the bar at the Mexican Village restaurant. Suffice it to say, that other "reasonable man" would view Ambrosio simply as another patron; Ambrosio's entrance and approach would lack the import perceived by one aware of antecedent threats. A defendant's knowledge of uncontradicted antecedent threats must, therefore, be taken into consideration in the determination of the reasonableness of a belief in the necessity of self-defense.

The record of the instant case includes adequate uncontradicted facts from which the jury could conclude defendant had been the aggressor; the same facts, however, support a finding that defendant's actions had been induced by threats made against him by the deceased. Defendant had seen the decedent inflict a vicious beating on two young girls; he knew from personal observation that decedent regularly carried a gun. Pena was aware Ambrosio had been charged with assault with a deadly weapon and had committed numerous armed robberies. In addition, Ambrosio had told Pena he had killed someone while out joy riding and, on another occasion, had beat up two men and sent them to the hospital. Pena had particular cause to be concerned with Ambrosio's precipitate anger, for Ambrosio had told him that "he had almost killed a black man" simply for speaking with a white woman.

Moreover, Pena heard Ambrosio make the following threats against him: "Don't come down. I am going to go out and look for you. Be sure to look behind every time you turn around," and "Tell the ------ ------ I am ready

for him. I am waiting for him." In view of defendant's knowledge of Ambrosio's character and activities, having received such threats, defendant might well have feared death or great bodily injury regardless of the fact that neither was expressly threatened. Such belief would be reasonable in view of the fact defendant knew decedent was a karate expert who was 5½ inches taller and approximately 80 pounds heavier than he.

In view of the above, it appears defendant was entitled to an instruction directing jurors to consider the effect of Ambrosio's threats, i.e., whether defendant's knowledge of those threats justified quicker and, perhaps, harsher action than would be expected from a person who had not received similar threats. ■ The People would limit those occasions necessitating the jury's instruction with respect to the effect of threats to those instances wherein the defendant was subject to prior physical violence at the hands of the victim. We find such restriction without precedent. To the contrary, analysis of *People* v. *Bradfield, supra,* 30 Cal.App. 721, decided by this district in 1916, reveals the instruction is necessary despite the absence of prior physical altercation. The defendant, in *Bradfield,* managed a corporation which repeatedly made use of a road located on property allegedly owned by the victim, Henley. On one occasion, three years prior to the day he was shot, Henley personally advised defendant that he objected to defendant's or the corporation's use of the road without payment for the privilege; Henley was threatening and abusive. During the interchange, Mrs. Henley stood by a building leveling a double barreled shotgun in defendant's direction. The *Bradfield* court characterized the incident as a "wordy encounter" and specifically noted Henley had "made no attack upon Bradfield and showed no weapons." (*Id.,* at p. 723.) Aside from reporting this meeting, the court recounted no face-to-face meeting between the parties in the intervening years. Thus, case authority directly contradicts the People's theory, for the incident in *Bradfield* can hardly be characterized as an instance wherein the defendant was subjected to physical violence at the hands of the victim. Despite the absence of such violence, the *Bradfield* court upheld the necessity for the jury instruction concerning the effect of threats of harm on the defendant's actions. It is apparent, therefore, that the necessity for the instruction arises even in the absence of a prior altercation involving physical interaction.

■ The People assert the omitted jury instruction was harmless error, if error at all, inasmuch as the jury's verdict indicated its finding of a specific intent to kill. Such reasoning is circuitous and specious for two reasons. First, a finding of specific intent to kill could result from focusing on defendant's actions without consideration of his knowledge of prior threats; had the jury been properly instructed, a different finding might have been reached. Second, absent the proffered instruction, the jury might not have

taken into consideration the full scope of facts and circumstances rightfully considered in a determination of whether an intent to kill was justifiable or excusable. Thus, assuming it did find an intent to kill, the jury was precluded from determining whether the act flowing from that intent was justifiable or excusable. The omission is, as we noted *ante,* reversible error. (*People* v. *Bush, supra,* 84 Cal.App.3d 294; *People* v. *Torres, supra,* 94 Cal.App.2d 146.)

## II

■ Defendant argues the constitutional protection against double jeopardy precludes his further prosecution on charges of either murder I or II. We agree.

Article I, section 15 of the California Constitution provides in pertinent part, "Persons may not twice be put in jeopardy for the same offense, . . ." At his second trial, defendant was tried for murder, but convicted of voluntary manslaughter. That conviction is reversed by virtue of the decision announced today. Reversal, however, does not entitle the People to another opportunity to prosecute defendant on charges of murder I or II, for a defendant who obtains reversal of a conviction of a lesser included offense may not be tried again for the greater offense; although a verdict may not have been expressly reached on the greater offense, an acquittal is entered by implication. (*Green* v. *United States* (1957) 355 U.S. 184 [2 L.Ed.2d 199, 78 S.Ct. 221, 61 A.L.R.2d 1119]; *Stone* v. *Superior Court* (1982) 31 Cal.3d 503, 518 [183 Cal.Rptr. 647, 646 P.2d 809].) ■ Both federal and California courts have long held a criminal defendant may not be retried for an offense following an acquittal. (See *United States* v. *Ball* (1896) 163 U.S. 662, 671 [41 L.Ed. 300, 303, 16 S.Ct. 1192]; *People* v. *Webb* (1869) 38 Cal. 467, 479-480.)

## III

■ In the event this court had disagreed with defendant's initial contention addressing the omitted jury instruction, defendant proffered the trial court's refusal to grant his motion for new trial as additional prejudicial error. We agree.

■ Generally, the decision to deny a motion for new trial is within the trial court's discretion; however, that decision may be disturbed on review upon a clear showing that the trial court has abused its discretion. (*People* v. *Marchialette* (1975) 45 Cal.App.3d 974 [119 Cal.Rptr. 816]; *People* v. *Bryan* (1970) 3 Cal.App.3d 327 [83 Cal.Rptr. 291].) ■ The facts of this case establish such a showing.

On October 16, 1981, the jury's verdict was recorded. On January 20, 1982, the court made specific findings of juror misconduct and declared a mistrial. In early March, the Court of Appeal directed the trial court to accept defendant's plea of once in jeopardy to murder I and II. The trial court did accept defendant's plea on March 19; however, after vacating its order of January 20, granting a mistrial, the court reinstated defendant's conviction for voluntary manslaughter despite the earlier findings of juror misconduct. Defendant petitioned the Court of Appeal for a writ of prohibition. On April 8, in its denial of that writ, the reviewing court noted, "On recording of verdict, no mistrial could be granted." Again, defendant sought a new trial; his renewed motion was denied on May 20.

The above course of events provides ample evidence of procedural error. The verdict was "complete" on October 16, 1981, after the jury had been polled and its verdict entered in the minutes (Pen. Code, § 1164); the jury's function had ceased, and the trial was closed. (*People* v. *Lee Yune Chong* (1892) 94 Cal. 379 [29 P. 776]; *People* v. *Peavey* (1981) 126 Cal.App.3d 44, 49 [178 Cal.Rptr. 520].) The court was no longer entitled to exert any control over the verdict. (*Ibid.*) As the Court of Appeal noted on April 8, the court was not entitled to declare a mistrial. The proper remedy for a verdict resulting from juror misconduct is the grant of a new trial. ■
Penal Code section 1181 provides in pertinent part, "When a verdict has been rendered or a finding made against the defendant, the court may, upon his application, grant a new trial . . . when the jury has . . . been guilty of any misconduct by which a fair and due consideration of the case has been prevented. . . ." ■ Thus, it is apparent that the trial court erroneously denied defendant's motion for a new trial, for there is absolutely no evidence on the record to rebut the presumption of prejudice raised by juror misconduct. (*People* v. *Adame* (1973) 36 Cal.App.3d 402, 405 [111 Cal.Rptr. 462].) Absent such evidence, defendant was entitled to a new trial. As we have noted in our discussion *ante,* consideration of defendant's culpability at that new trial would not include the consideration of guilt on charges of either murder I or II.

## IV

Finally, defendant characterizes various evidentiary rulings as abuses of the court's discretion. We disagree. Although we have concluded reversal is mandated by the court's failure to properly instruct the jury, we explain the rationale for our conclusions on the evidentiary issues lest they arise within the context of future proceedings.

■ Evidence Code section 352 provides that the "court in its discretion may exclude evidence if its probative value is substantially outweighed by

the probability that its admission will . . . create substantial danger of undue prejudice . . . ." On appeal, reversal is not warranted simply by a state of facts affording an opportunity for reasonable minds to differ on whether proffered evidence is more probative than prejudicial or whether the converse is true. Rather, relief is unwarranted absent a finding that the injury is of such gravity as to amount to a manifest miscarriage of justice. (*Ford* v. *State of California* (1981) 116 Cal.App.3d 507 [172 Cal.Rptr. 162]; *Brown* v. *Newby* (1940) 39 Cal.App.2d 615, 618 [103 P.2d 1018].)

 Clearly, the court's decision to permit the district attorney to ask defendant whether he was an ambulance chaser does not fall within that category of decisions susceptible to characterization as a manifest miscarriage of justice. A careful reading of the facts reveals the great extent to which testimony from both Jesse and Russell Halpern was relied upon to establish defendant's state of mind. The extent of witnesses' bias in defendant's favor was relevant to the determination of the amount of weight to be afforded their testimony. Evidence that the Halperns had a vested interest in defendant's continued employment with their firm could well bear on that determination. Thus, evidence that defendant was in the practice of procuring personal injury clients for the Halperns was relevant to show the extent to which the Halperns' firm might have suffered in defendant's absence and, as a result, the extent to which their testimony might have been biased.

 Defendant also directs our attention to three instances in which the court refused to permit the introduction of certain testimony, not one of which, in our opinion, amounts to an abuse of the court's discretion. For example, the court ruled inadmissible evidence that Juan Echevarria had felt justified on one occasion in holding the decedent at bay with a gun. Despite defendant's assertion that the reasonableness of Echevarria's action lent credence to the reasonableness of his own action, the court was entitled to view the prejudicial impact of the proffered testimony as far outweighing its relevance, for the reasonableness of Echevarria's action sheds no light on the reasonableness of defendant's actions absent any indication either that conditions surrounding the two events were similar or that defendant knew of the former incident and was certain that Echevarria's action was warranted.

 In another incident, the court refused to permit Russell Halpern, a lawyer, to testify either to the nature of his representation of the decedent in 1977 or to any communications with Ambrosio during the course of their lawyer-client relationship. The court based its decision on the fact that the decedent's father, Francisco Ambrosio, Sr., the duly qualified representative of decedent's estate, asserted the lawyer-client privilege. According to Evidence Code section 954, the holder of the privilege may "refuse to disclose . . . a confidential communication between client and

lawyer . . . ." By statute, the personal representative of a deceased client is a "holder of the privilege." (Evid. Code, § 953, subd. (c).) Ambrosio, Sr., was therefore clearly entitled to assert the lawyer-client privilege. ■ California courts have long recognized exercise of the attorney-client privilege may result in decisions which appear unjust; despite the inherent risk, however, the courts have respected the necessity of protecting the privilege. (*City & County of S. F.* v. *Superior Court* (1951) 37 Cal.2d 227, 235 [231 P.2d 26, 25 A.L.R.2d 1418]; *People* v. *Flores* (1977) 71 Cal.App.3d 559, 563 [139 Cal.Rptr. 546].) ■ On the facts of this case, the "sacred" privilege of confidential communication between client and attorney was properly preserved. (*Id.,* at p. 565.) We cannot agree the privilege should have been dissolved simply to divulge that in 1977 decedent had informed his attorney he had been charged with assault with a deadly weapon; even in the absence of the attorney-client privilege, the court's refusal was warranted by the fact that the proffered testimony was minimally relevant to the case at hand.

■ Defendant also asserts the court erroneously refused to permit Ambrosio, Sr., to testify to the fact his son said that he (decedent) had told defendant "If you want the money that way, you better get a gun and come and get it." The court's decision was not clearly erroneous, for the relevance of the proffered testimony is unclear. The statement does little more than establish the extent of decedent's unwillingness to voluntarily pay the bail forfeitures. It contains neither threat nor indication of hostility flowing from decedent to defendant.

■ Similarly, we cannot agree with defendant's final assertion. The trial court did not erroneously refuse to allow introduction of evidence decedent had a juvenile record for possession of a Molotov cocktail. Again, the prejudicial nature of this fact weighs strongly against its probative value, for such evidence sheds little light on inquiries relevant to a determination of defendant's culpability, i.e., the nature of decedent's attitude toward defendant or defendant's perception of decedent's attitude toward him.

The judgment is reversed and the cause remanded to the trial court for retrial. The trial court is directed to release defendant on reasonable bail. The habeas corpus petition is denied; the issue of juror misconduct raised therein is moot.

Lillie, J., and Gutierrez, J.,* concurred.

A petition for a rehearing was denied March 1, 1984, and respondent's petition for a hearing by the Supreme Court was denied May 2, 1984.

---

*Assigned by the Chairperson of the Judicial Council.